891 P.2d 916

**THORACIC CARDIOVASCULAR ASSOCIATES, LTD., Thomas J. Trahan and Edward G. Murphy, Plaintiffs–Appellees,**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant–Appellant.**

**No. 1 CA–CV 92–0366.**

Court of Appeals of Arizona, Division 1, Department E.

Sept. 13, 1994.

Review Denied March 21, 1995.

450

Rake, Downey, McGovern, Shorall & Cohen, P.C. by William J. Downey, Phoenix, for defendant-appellant.

Meyer, Hendricks, Victor, Osborn & Maledon by R. Douglas Dalton and Mark A. Fuller, Phoenix, for plaintiffs-appellees.

## OPINION

TOCI, Judge.

Thoracic Cardiovascular Associates, Ltd. and Thomas J. Trahan (collectively, "Thoracic")[1] sued St. Paul Fire and Marine Insurance Company ("St. Paul") seeking a declaratory judgment requiring St. Paul to provide coverage on a claims made professional liability insurance policy. St. Paul appeals from the trial court's grant of summary judgment in favor of Thoracic.

We must decide whether coverage exists under a claims made professional liability insurance policy when a claim is not reported to the insurer within the policy period. In order to resolve this question, we must also decide whether the doctrine of impossibility excuses untimely reporting of a claim under a claims made policy.

We conclude that the trial court erred in granting summary judgment against St. Paul. We hold that because notice of a claim within the policy period is a material part of the consideration for a claims made policy, to invoke coverage a claim must be made and reported to the insurer during the policy period. We further hold that the doctrine of impossibility does not excuse late reporting of claims under claims made policies. Accordingly, we reverse the trial court's grant of summary judgment against St. Paul and remand with directions to enter judgment for St. Paul.

## I. FACTS AND PROCEDURAL HISTORY

St. Paul issued a claims made professional liability insurance policy to Thoracic for the period from November 1, 1987 through May 1, 1988. The policy stated two requirements

---

1. Although Dr. Edward G. Murphy is named in the caption, his involvement in this matter is solely as a shareholder in Thoracic Cardiovascular Associates, Ltd.

for coverage: (1) "the professional service must have been performed (or should have been performed) after [the] retroactive date that applies," [2] and (2) "[t]he claim must also first be made while this agreement is in effect." Under the policy, a "claim is made on the date [the insured] first report[s] an incident or injury to" St. Paul or its agent.

The policy also contained a provision allowing Thoracic to purchase an optional extension of coverage, referred to as a "reporting endorsement." This endorsement would have allowed Thoracic to report claims to St. Paul after the policy term and before the end of the term of the reporting endorsement. The policy provided that St. Paul would sell the reporting endorsement to Thoracic for a premium based on the rules and rating plans being used on the day coverage would begin. According to the policy, the reporting endorsement must be requested in writing within thirty days after the end of the policy term.

On February 16, 1988, before the end of the policy term, Thoracic canceled the liability policy issued by St. Paul. On March 4, 1988, sixteen days after the policy was canceled, St. Paul's underwriting department sent a certified letter to Thoracic advising Thoracic that its policy covered only claims made within the policy term. The letter warned that unless Thoracic purchased the optional reporting endorsement coverage within the time stated in the policy or obtained coverage under a replacement policy, it would not be covered for claims arising out of acts performed prior to the termination date that were not reported until after the termination date. Specifically, the letter stated:

> This is a "claims made" form of coverage. This means you do *not* have coverage for claims arising out of acts performed prior to the termination for which a claim may be made after the termination date, unless you purchase reporting endorsement coverage.
>
> Reporting endorsement coverage extends the time in which a claim may be made for acts which occurred before the termination date. . . .

You may not need this endorsement extension if you have obtained a replacement policy providing coverage for prior acts.

> IF YOU DO NOT PURCHASE THE OPTIONAL REPORTING ENDORSEMENT WITHIN THE TIME PERIOD STATED IN YOUR POLICY, OR IF YOU DO NOT OBTAIN COVERAGE UNDER A REPLACEMENT POLICY, THEN *YOU DO NOT HAVE COVERAGE* FOR CLAIMS ARISING OUT OF ACTS PERFORMED *PRIOR* TO THE TERMINATION DATE FOR WHICH A CLAIM MAY BE MADE *AFTER* THE TERMINATION DATE.

This letter clearly indicated that St. Paul would not provide coverage for claims reported after termination of the policy unless the reporting endorsement was purchased. Despite this warning, Thoracic neither purchased the endorsement nor obtained a replacement policy.

To further ensure that Thoracic understood the effect of its decision to cancel the policy and decline the reporting endorsement coverage, on March 21, 1988, Jacque Cumbie, an authorized insurance broker for St. Paul, sent another letter to Thoracic. The letter again addressed the effect of the cancellation:

> You had advised our office that you did not want to buy the Extended Reporting Period Endorsement from St. Paul. The policy was on a "claims made" form of coverage. This means that you will note [sic] have coverage from claims arising out of acts performed prior to the termination date for which a claim may be made after termination date, unless you purchase Reporting Period Endorsement coverage.
>
> Please sign the paper attached stating you understand "Claims Made" form of coverage and did not wish to purchase endorsement, and return to our office.

As requested, Thoracic signed and returned the form. By signing the form, Thoracic acknowledged that it understood "the 'Claims Made' form of coverage and did not wish to purchase endorsement."

---

**2.** According to the policy in this case, the retroactive date is September 1, 1979.

452

On October 15, 1987, Alfonso and Linda Grimaldi filed a medical malpractice suit against Thoracic. The Grimaldi complaint alleged that Thoracic negligently provided professional health care services in 1985. When the Grimaldi lawsuit was filed, Thoracic was covered by the claims made professional liability insurance policy issued by St. Paul. Thoracic was not served with the summons and complaint in the Grimaldi suit, however, until July 12, 1988, approximately five months *after* it canceled its policy with St. Paul. Prior to that date, Thoracic was not aware of the existence of the Grimaldi claim.

On August 30, 1988, more than six months after terminating coverage, Thoracic notified St. Paul of the Grimaldi lawsuit. Thoracic requested that St. Paul confirm coverage and provide legal representation to defend against the Grimaldi claim. St. Paul denied coverage and refused to provide legal representation because the claim had not been reported to St. Paul during the policy period as required under the claims made policy.

On August 31, 1990, Thoracic filed the present lawsuit seeking, among other things, declaratory judgment that St. Paul's coverage extended to the Grimaldi claim. St. Paul moved for summary judgment, arguing that under Division Two's decision in *Sletten v. St. Paul Fire & Marine Ins. Co.,* 161 Ariz. 595, 780 P.2d 428 (App.1989), it did not breach the insurance contract. In response, Thoracic argued that *Sletten* did not control because Thoracic had no knowledge of the Grimaldi claim within the policy period. Consequently, according to Thoracic, it was unable to inform St. Paul of the claim within the policy period. The trial court agreed, granting summary judgment in favor of Thoracic. In rendering its decision, the trial court stated:

> The Court·finds that when insureds under a "claims made" policy, ha[ve] a lawsuit filed against them, and it is undisputed that the insureds have no way of knowing that the suit has been filed and but for the failure of the Plaintiff in that lawsuit to serve the complaint within the policy period, the claim would have been made to the insurer, there is coverage under a "claims

made" policy even though notice is given after the policy ends.

St. Paul appeals.

## II. DISCUSSION

### A. Background

■ We initially consider the difference between an "occurrence" policy and a "claims-made" policy. An "occurrence" policy of professional liability insurance covers an act or omission that occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted. *Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 So.2d 512, 514 (Fla.1983) (citing *Samuel N. Zarpas, Inc. v. Morrow,* 215 F.Supp. 887, 888 (D.N.J.1963); *Bill Binko Chrysler–Plymouth, Inc. v. Compass Ins. Co.,* 385 So.2d 692, 693 (Fla.Dist.Ct.App. 1980); *Ranger Ins. Co. v. United States Fire Ins. Co.,* 350 So.2d 570, 572 (Fla.Dist.Ct.App. 1977). This type of policy requires that notice be given to the insurer "within a specified time after the insured event." *Stine v. Continental Casualty Co.,* 419 Mich. 89, 349 N.W.2d 127, 134 (1984). Because injuries from professional malpractice claims may not manifest themselves for years after the occurrence policy has expired, however, an exposure time, or a "tail," is created. A tail is the time lapse between the date of the negligent act or omission and the time when a claim is made. *Gulf,* 433 So.2d at 515.

Thus, occurrence policies with a "tail" that extends beyond the policy period are historically associated with certain difficulties. One problem with occurrence policies is that the insurer cannot calculate the premium for the risk with any certainty. The insurer must compute premiums for occurrence professional liability policies at current rates while claims must be resolved at market rates, sometimes long after the premiums have been paid. Gerald Kroll, Comment, *The "Claims Made" Dilemma in Professional Liability Insurance,* 22 UCLA L.Rev. 925, 928 (1975). Another difficulty with occurrence policies is that when professional negligence continues over a period of time, and an insured changes from one occurrence carrier to another, uncertainty exists about which insurer will provide coverage. *Id.* at 930.

■ Consequently, to reduce exposure to an unpredictable and lengthy "tail" of lawsuits filed years after the occurrence they agreed to protect against, underwriters shifted to the "claims made" policy. *Pacific Employers Ins. Co. v. Superior Court,* 221 Cal. App.3d 1348, 270 Cal.Rptr. 779, 784 (1990). An insurer who knows that claims will not arise under the policy after its expiration can underwrite a risk and calculate premiums with greater certainty. *Id.* 270 Cal.Rptr. at 785. The insurer can establish its reserves "without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of negligence." *Id.*

■ The "claims made" policy differs from an "occurrence" policy in several important aspects. Because it triggers coverage, transmittal of the notice of the claim to the insurer is the most important aspect of the claims made policy. A claims made policy extends coverage if " 'the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term.' " *Id.* (quoting 7A John Alan Appleman, *Insurance law and Practice* § 4504.01, at 312 (Berdal ed. 1979)). "The timing of the making of the claim in such policies stands in equal importance with the error or omission as the insured event." *Stine,* 349 N.W.2d at 134. Notice to the insurer of a claim made against the insured is generally required to be given during the policy period or within a specified amount of time after the policy period. "The essence, then, of a claims-made policy is *notice to the carrier within the policy period.*" *Gulf,* 433 So.2d at 514 (emphasis added).

## B. Analysis

■ Against this backdrop, we turn to the insurance policy in this case. It is clearly a claims made policy. The coverage summary that is attached to the policy provides: "This Coverage Summary shows the limits and extent of coverage under your Physicians' Professional Liability Protection— Claims Made." Further, the reporting language in the policy provides:

**When you're covered**

*To be covered* the professional service must have been performed (or should have been performed) after your retroactive date that applies. *The claim must also first be made while this agreement is in effect.*

**When is a claim made?**

*A claim is made on the date you first report an incident or injury to us or our agent.* You must include the following information:

● Date, time and place of the incident.
● What happened and what professional service you performed.
● Type of claim you anticipate.
● Name and address of injured party.
● Name and address of any witness.

(Emphasis added.) We find that this plain and unambiguous language requires that the insured report a claim to the insurer while the policy is in effect. *See Sletten,* 161 Ariz. at 596–97, 780 P.2d at 429–30 (claims made professional liability policy unambiguously required claims to be reported to insurer during policy period); *Slater v. Lawyers' Mut. Ins. Co.,* 227 Cal.App.3d 1415, 278 Cal. Rptr. 479, 482 (1991) (same). Such a report to the insurer within the policy period is an express condition precedent to coverage. *See Gulf,* 433 So.2d at 515 (coverage depends on claim being made and reported to the insurer during policy period); *Zuckerman v. National Union Fire Ins. Co.,* 100 N.J. 304, 495 A.2d 395, 406 (1985) ("event that invokes coverage under a 'claims made' policy is transmittal of notice of the claim to the insurance carrier").

Here, the negligence upon which the Grimaldis' medical malpractice lawsuit is based occurred in 1985, during the term of Thoracic's policy with St. Paul. And, when the Grimaldis filed their lawsuit in superior court on October 15, 1987, the policy was still in effect. Thoracic, however, did not report the claim to St. Paul until August 30, 1988, approximately six months after cancellation of the policy. Thus, the report was too late to trigger coverage.

Thoracic cites several cases that establish a general rule that when a delay in notice is found to be based upon a reasonable excuse,

such excuse restores the timeliness of the notice. *See Lindus v. Northern Ins. Co. of New York,* 6 Ariz.App. 74, 429 P.2d 708 (1967), *vacated,* 103 Ariz. 160, 438 P.2d 311 (1968); *Rowe v. National Sec. Fire & Casualty Co.,* 4 Ark.App. 16, 626 S.W.2d 622 (1982); *Hull v. Hartford Fire Ins. Co.,* 100 N.H. 387, 128 A.2d 210 (1956). While properly acknowledging that this general rule is a product of cases involving occurrence policies, Thoracic contends that "there is no logical reason" why this general rule should not be extended to claims made policies. Based on the distinction between the two types of policies and Division Two's decision in *Sletten,* we disagree.

In *Sletten,* Division Two of this court held that even if an insurer is not prejudiced by late reporting, it need not provide coverage under a medical malpractice claims made insurance policy where the insured reports the claim to the insurer after the policy term has ended. 161 Ariz. at 597, 780 P.2d at 430. There, the insured failed to notify the insurer of a potential claim within the policy period. As in this case, the insured in *Sletten* had been offered extended reporting coverage, which it declined. The insured argued "that so long as [the insurer] was not prejudiced by the late reporting, coverage should exist," even under a claims made policy. *Id.* The court rejected this argument, noting that the late notice/prejudice rule "was developed with respect to 'occurrence' policies which provide coverage for negligent conduct occurring during the policy period regardless of when the claim is made." *Id.* Division Two then quoted extensively from the Florida Supreme Court's decision in *Gulf:*

> Claims-made policies, likewise, require that notification to the insurer be within a reasonable time. Critically, however, claims-made policies require that notice be given *during the policy period* itself. When an insured becomes aware of any event that could result in liability, then it must give notice to the insurer, and that notice must be given "within a reasonable time" or "as soon as practicable"—at all times, however, during the policy period. ... Coverage depends on the claim being made and reported to the insurer dur-

ing the policy period. Claims-made or discovery policies are essentially *reporting* policies.... If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties. This we cannot and will not do.

*Id.*

Thus, the *Sletten* court found the *Gulf* rationale compelling and refused to extend the late notice/prejudice rule to claims made policies. *Id.* It agreed with the Florida court that the effect of allowing late notice "would be to convert claims made policies into occurrence policies" because, in the absence of actual prejudice from late reporting, all negligence during the policy period would be covered. *Id.* Further, in *Sletten,* Division Two said that it could "discern no public policy that mandates that only occurrence coverage be sold in Arizona," especially where an insured was offered, but declined, extended reporting coverage by the insurer that would have protected the insured. *Id.* at 597–98, 780 P.2d at 430–31. We find *Sletten* dispositive.

Nevertheless, Thoracic argues that *Sletten* and *Gulf* are distinguishable from the present case. In both *Sletten* and *Gulf,* the insured became aware of a liability-triggering event during the policy period, but failed to report such claim to the insurer. *Sletten,* 161 Ariz. at 596, 780 P.2d at 429; *Gulf,* 433 So.2d at 513. Thoracic argues, therefore, that these cases have no application to the situation presented in this case because Thoracic had no knowledge of the Grimaldi claim during the policy period. Thoracic contends that since "this is a case in which an insured, through no fault of his own, had no knowledge of a lawsuit that had been filed against him ... coverage in this case does not rest merely on the absence of prejudice to St. Paul, but on the fact that the required notification was impossible under the circumstances." We reject this argument.

Because the essence of a claims made policy is notice to the insurer within the policy period, *Gulf,* 433 So.2d at 514, the reasoning of *Sletten* and *Gulf* applies equally where an insured has no knowledge of the claim and, therefore, cannot report the claim to the insurer. To hold that the reporting requirement should be excused any time that the claim was not discovered during the policy period is to essentially convert claims made policies into occurrence policies in those cases. This we will not do. *See Sletten,* 161 Ariz. at 597, 780 P.2d at 430.

Rather, we agree with the rationale of the New Jersey Supreme Court in *Zuckerman,* 495 A.2d at 406, "that an extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, *gratis,* resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." Such a change in the coverage provided by claims made policies would significantly affect both the basis upon which premiums have been calculated and the cost of claims made insurance. *Id.* "So material a modification in the terms of this form of insurance widely used to provide professional liability coverage both in this State and throughout the country would be inequitable and unjustified." *Id.*

Our decision is buttressed by the California Court of Appeals decision in *Slater.* There, a lawsuit was filed against an insured during the period his claims made insurance policy was in effect. The insured, however, did not become aware of the claim until after his policy had expired; thus, he did not notify his insurer until after the policy period had expired. The insurer denied coverage, due to late reporting. 278 Cal.Rptr. at 480.

As in this case, in *Slater,* the insured had been "offered the opportunity to protect himself against unknown claims by purchasing an extended reporting period endorsement, which he declined." *Id.* at 484. The *Slater* court concluded that the provisions of the policy requiring that a claim be made and reported to the insurer during the policy period were plain and unambiguous. *Slater,* 278 Cal.Rptr. at 482. Further, the court concluded that the late notice/prejudice rule

was not applicable. *Id.* at 482–83. The court held that because the insured failed to report the claim within the policy period, the insurer was not required to provide coverage under the policy. *Id.* at 484.

■ Notwithstanding, Thoracic argues that the doctrine of impossibility or impracticability should excuse its failure to comply with the notice requirement as a condition precedent to coverage. Thoracic contends that had the insured in *Slater* raised the defense of impossibility, the outcome of the case may have been different. Thoracic believes that the defense of impossibility should be available where it is impossible for the insured to give the required notice because he had no knowledge of the claim. We disagree.

The Colorado Court of Appeals addressed a similar issue in *St. Paul Fire & Marine Ins. Co. v. Estate of Hunt,* 811 P.2d 432 (Colo.Ct.App.1991). There, a medical malpractice claim was filed during the period when the claims made policy was in effect, but was not reported to the insurer until after the policy had expired. After a jury verdict against the insurer, the trial court entered judgment finding that the doctor's failure to provide timely notice was excused by his mental impairment. The Colorado Court of Appeals reversed, holding that the policy did not provide coverage for an untimely reported claim. The court stated:

> Impracticability excuses the non-occurrence of a condition *if the occurrence of the condition is not a material part of the agreed exchange* and forfeiture would otherwise result.
>
> . . . .
>
> It is because of [the] significant role of notice in "claims-made" policies that numerous courts have held that excusing a delay in notice beyond the policy period should not be done, because to do so would alter a basic term of the insurance contract which expresses the parties' agreement.

Here, we conclude that the condition requiring the insured to provide notice of a claim during the policy period was a material part of the agreed exchange. Therefore, impracticability cannot serve as an

excuse for the non-occurrence of such a material condition.

*Id.* at 434–35 (citations omitted). We find this reasoning persuasive.

■ Thoracic argues that the *Hunt* decision is flawed because that court incorrectly and "[w]ithout any reasoned or persuasive analysis," determined that the notice requirement of a claims made policy was "material" to the coverage. As we discuss above, however, the condition requiring the insured to provide notice of a claim during the policy period is a material part of the agreed exchange. No coverage exists unless notice is given during the policy term. As recognized by the court in *Hunt,* there can be no excuse for the nonperformance of a material provision of the contract between St. Paul and Thoracic. *See Hunt,* 811 P.2d at 435.

■ Furthermore, "[i]mpossibility does not excuse nonperformance where the promisor has indicated an intent to assume the risk thereof." *Wiggins v. Warrior River Coal Co.,* 696 F.2d 1356, 1359 (11th Cir.1983); 17A Am.Jur.2d *Contracts* § 684 (1991); *see generally,* 6 Arthur Linton Corbin, *Corbin on Contracts* § 1328 (1962). Where, as here, an insured elects to purchase a claims made policy and does not elect to purchase occurrence coverage, the insured assumes the risk that claims will not be covered unless they are *both* discovered *and* reported during the policy period.

St. Paul was entitled to limit its coverage by clear and unambiguous language. "[I]n the absence of conflict with statute or public policy, insurers may by unambiguous and clearly noticeable provisions limit their liability and impose such reasonable conditions as they wish upon the obligations they assume by their contract." *Livingston Parish Sch. Bd. v. Fireman's Fund Am. Ins. Co.,* 282 So.2d 478, 481 (La.1973); *see also Slater,* 278

Cal.Rptr. at 483–84 (insurance company has right to limit coverage of policy issued by it and when it does so, the plain language of the limitation must be respected). "[T]he insured received what [it] paid for by the present policy, with premiums presumably reduced to reflect the limited coverage." *Livingston Parish,* 282 So.2d at 483; *see also Gulf,* 433 So.2d at 516 (same). Here, St. Paul has limited its risk by clearly stating that no coverage exists unless the insured complies with the requirement of discovering and reporting the claim within the policy period.

A word about the dissent. According to the dissent, the policy is ambiguous because it blurs the distinction between the different usages of "claim." The dissent also asserts that the St. Paul letter to Thoracic did not plainly and unambiguously state that if the reporting endorsement was rejected, the policy would not apply to claims that were made against Thoracic but not reported during the policy period. We are not persuaded by those arguments.

Reading the policy as a whole, as we must, there is no blurring of the different meanings of "claim." Thoracic is protected against a professional liability claim that might be brought against it so long as the medical incident or accident that might give rise to such claim is reported within the policy term. If such incident or accident is reported, Thoracic is covered, even if the patient has not made any demand or filed any "claim." Conversely, where there has been a "claim" filed by a patient, but no report by the insured, no coverage exists. The policy thus makes it crystal clear that coverage is not dependent on the timing of the "claim" made by the patient but instead on the timing of the "claim" made by Thoracic.[3] That is precisely

**3.** Page one of the policy provides:

**When you're covered**
*To be covered* the professional service must have been performed (or should have been performed) after your retroactive date that applies. *The claim must also first be made while this agreement is in effect.*
**When is a claim made?**

*A claim is made on the date you first report an incident or injury to us or our agent.* You must include the following information:
● Date, time and place of the incident.
● What happened and what professional service you performed.
● *Type of claim you anticipate.*
● Name and address of injured party.
● Name and address of any witness.
(Emphasis added.)

why Thoracic was offered an optional *reporting* endorsement.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and remand for entry of judgment in favor of St. Paul, determining that there is no coverage for the Grimaldi claim.

CONTRERAS, J., concurs.

FIDEL, Judge, dissenting.

The first defining feature of this "claims-made" coverage case is that a claim *was* made against the insureds while their policy was in effect. The second defining feature is that the insureds did not learn of the claim until after the policy expired. The third defining feature is that the insureds had no reason to anticipate the claim before they learned it had been filed. Accordingly, it was impossible to notify the insurer of the claim until after the policy had expired.

The majority writes, "To hold that the reporting requirement should be excused anytime that the claim was not discovered during the policy period is to essentially convert claims made policies into occurrence policies in those cases." With this broad statement I agree. But it is a straw horse in this case. Here the issue is far narrower. The trial court ruled only that the reporting requirement should be excused if a claim was made but neither discovered nor reasonably foreseeable during the policy period. Only in such rare circumstances, according to her ruling, may a claims-made insured invoke the impossibility doctrine to excuse a late report.

The majority responds that "impossibility does not excuse nonperformance where the promisor has indicated an intent to assume the risk thereof." With this broad statement I also agree. I disagree, however, with the majority's assertion that the policy in this case is "plain and unambiguous" in assigning the risk of impossibility to the insured.

The flaw in the policy lies in its shifting and inconsistent usage of the term "claim." At page one of the introduction, the insurer announces, "We've written this policy in plain, easy-to-understand English." In a medical malpractice liability policy, the plain, easy-to-understand, English meaning of "claim" is an injured person's liability claim against the insured. The policy itself repeatedly employs this common usage, which I will refer to as "usage one." To take two examples:

> This agreement provides protection against professional liability *claims* which might be brought against you in your practice as a physician.
>
> \*  \*  \*  \*  \*  \*
>
> **Each person limit.** This is the most we'll pay for all *claims* resulting from the injury or death of any one person.

Emphasis added.

The policy also attempts, however, to detach the word "claim" from common usage and assign it a special meaning, which I will call "usage two". In a section emphasized by the majority, the policy provides:

> **When is a claim made?**
>
> A *claim* is made on the date you first report an incident or injury to us or our agent. You must include the following information:
> - Date, time and place of the incident.
> - What happened and what professional service you performed.
> - Type of *claim* you anticipate.
> - Name and address of injured party.
> - Name and address of any witness.

Emphasis added.

In this section, the policy attempts to redefine "claim" as the insured's report to the insurer. The policy writers, however, cannot confine themselves to their rarified usage two. Instead, irresistibly, they slip back to usage one, as in the very redefinitional section just quoted, which speaks of the insured's obligation to report the "type of *claim* you anticipate." Thus, their redefinition itself depends on the more common usage as a component: a "claim" is a report of a made or potential claim.

Elsewhere in the policy, the writers wholly ignore their redefinition and speak plainly and differentially of a report and a claim made, confining the latter term to usage one.

In the section describing the insured's reporting obligation, the policy provides:

> Tell us or our agent what happened as soon as possible. Do this *even though no claim has been made* but you or another protected person is aware of having done something that may later result in *a claim.*

> \* \* \* \* \* \*

> If Professional Hospital Liability Protection—Claims Made is included in this policy, we won't consider a "Patient Incident Report" or "Variance Report" to be *your report of a claim made*—even if you send it to us or one of our agents.

Emphasis added. In these sections, the policy actually achieves the "plain, easy-to-understand English" that it promises: a *claim made* against the insured is one thing; the insured's *"report* of a claim made" is another.*

Keeping the clarity of this distinction in mind—one, I reiterate, that the policy writers themselves were forced to use in order to write intelligibly—I'll turn to the letter by which St. Paul attempted to warn its insured what it would risk by terminating the policy without tail coverage. That letter reads as follows: ˙

> This is a "claims made" form of coverage. This means you do *not* have coverage for claims arising out of acts performed prior to the termination for which a claim may be made after the termination date, unless you purchase reporting endorsement coverage.

> Reporting endorsement coverage extends the time in which a claim may be made for acts which occurred before the termination date....

> You may not need this endorsement extension if you have obtained a replacement policy providing coverage for prior acts. IF YOU DO NOT PURCHASE THE OPTIONAL REPORTING ENDORSEMENT WITHIN THE TIME PERIOD STATED IN YOUR POLICY, OR IF

YOU DO NOT OBTAIN COVERAGE UNDER A REPLACEMENT POLICY, THEN *YOU DO NOT HAVE COVERAGE* FOR CLAIMS ARISING OUT OF ACTS PERFORMED *PRIOR* TO THE TERMINATION DATE FOR WHICH A CLAIM MAY BE MADE *AFTER* THE TERMINATION DATE.

This letter, the most significant part of which St. Paul capitalized for emphasis, is helpful and instructive as far as it goes. Conspicuous by its absence, however, is the following additional warning (paraphrasing St. Paul's own language) that would have made a difference in this case:

> Further, if you do not purchase the optional reporting endorsement within the time period stated in your policy, or if you do not obtain coverage under a replacement policy, *then you do not have coverage for claims that you have not discovered and reported to us prior to the termination date, even if those claims were made against you prior to the termination date and arise out of acts performed prior to the termination date.*

To conclude, I would agree with the majority that this insurer had assigned the risk of impossibility to its insured if the policy writers, without blurring the clear distinction between a claim and a report, had plainly and unambiguously informed the insured that the policy applied only to claims or potential claims that were reported to the insurance company during the policy period, whether or not those claims were made during the policy period. Likewise, I would agree with the majority that this insurer had assigned the risk of impossibility to its insured if, in its termination letter, the insurer had plainly and unambiguously informed the insured that, if tail coverage were rejected, the policy would not apply to claims that were not reported during the policy period, even if, during the policy period, those claims had been made against the insured. Here, however, the policy was confusing and the termination letter misleading on this critical

---

* Without belaboring the policy further, by my count it employs the word "claim" nine times to refer to an injured person's liability claim against an insured; three times to refer to an insured's property damage claim against the insurer; once in the redefinitional section to define a claim made as the report that a liability claim has been made or may be made; and twice ambiguously in a way that might describe either the liability claim or the report.

point. For that reason, I would uphold the trial court's decision to apply the impossibility doctrine in this case, and I respectfully dissent from the majority decision to reverse.