**AMERICAN HOME ASSURANCE COMPANY, Plaintiff,**

v.

**James W. ABRAMS, Esq., In His Capacity as Administrator of the Estate of James M.S. Ullman, Esq.; The Estate of James M.S. Ullman; Salvatore Falconeri, In His Capacity as Executor of the Estate of Anthony Stergius; Raymond F. Gryga, In His Capacity as**

Administrator of the Estate of Robert F. Gryga; The Estate of Robert F. Gryga; and Robert Montemurro, In His Capacity as Executor of the Estate of Angeline C. Montemurro, Defendants.

No. 3:96CV01684(GLG).

United States District Court, D. Connecticut.

Sept. 30, 1999.

W. Phillip Jones, Avon, CT, for American Home Assurance Co.

Alan M. Solomon, Solomon, Krupnikoff & Wyskiel, Meriden, CT, for James W. Abrams.

Michael Joseph Walsh, Moukawsher & Walsh, Hartford, CT, for Salvatore Falconeri.

Stephen L. Jacques, Moore, O'Brien, Jacques & Yelenak, Cheshire, CT, for Robert Montemurro.

## OPINION

GOETTEL, District Judge.

In this declaratory judgment action,[1] American Home Assurance Company

---

**1.** This Court's power to issue a declaratory judgment is set forth in 28 U.S.C. § 2201(a), which provides in relevant part:

seeks a declaration that certain claims asserted by defendants Falconeri, on behalf of the Stergius Estate, and by Montemurro, on behalf of the Montemurro Estate, against the late James M.S. Ullman, Esq., are not covered by a Lawyer's Professional Liability policy which it issued to James M.S. Ullman, P.C.[2] Ullman's Estate has counterclaimed against American Home for breach of contract for failing to provide a defense to claims asserted against the Estate and for violation of Connecticut's Unfair Insurance Practices Act ("CUIPA"), C.G.S.A. § 38a–815, et seq. Subsequently, defendant Falconeri filed a counterclaim against American Home for breach of contract, bad faith, and violation of CUIPA and Connecticut's Unfair Trade Practices Act ("CUTPA"), C.G.S.A. § 42–110a, et seq.

American Home now moves for summary judgment [**Doc. # 51**], and Falconeri, as Executor of the Estate of Stergius, has cross-moved for summary judgment [**Doc. # 63**].[3] Following oral argument on the motions, the Court renders its decision granting the motion for summary judgment of American Home and denying the cross-motions of the defendants.

## STANDARD OF REVIEW

It is well-established that a motion for summary judgment will not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Rule

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

2. On December 12, 1996, a default judgment was entered against Raymond F. Gryga and the Estate of Robert Gryga as to liability. Therefore, American Home's claims against these defendants (in Counts II, V, and VIII) are not considered in this Opinion.

56(c), Fed.R.Civ.P.; see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. Anderson, 477 U.S. at 248, 106 S.Ct. 2505. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.1992) (internal citation and quotations omitted). The party moving for summary judgment bears the burden of showing that there exists no genuine dispute about an issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether a genuine dispute as a material fact exists, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. Anderson, 477 U.S. at 255, 106 S.Ct. 2505.

## FACTS

The facts in this case are essentially undisputed.

At all relevant times, James M.S. Ullman ("Ullman") was an attorney practicing law in Meriden, Connecticut. By written application dated April 24, 1993, Ullman, as president of James M.S. Ullman, P.C.,[4] applied to American Home for renewal of his lawyer's professional liability ("LPL")

3. Defendant Abrams has joined in the opposition filed by Falconeri to American Home's Motion for Summary Judgment. [**Doc. # 69**]. By letter dated July 13, 1999, the Court was advised that Robert Montemurro, In His Capacity as Executor of the Estate of Angeline C. Montemurro, joined in the objections of Falconeri to plaintiff's summary judgment motion as to the issues of law.

4. According to the records of the Connecticut Secretary of State, the corporation, James M.S. Ullman, P.C., had been forfeited on March 30, 1990.

policy. The policy that was issued, Policy No. LPL 7053308, was a "claims-made"[5] policy with a policy period from September 8, 1993, to September 8, 1994, and with liability limits of $200,000 per claim and $600,000 in the aggregate, subject to a stated per-claim deductible.

In 1994, Ullman was criminally charged with first-degree larceny as a result of his alleged embezzlement of clients' funds. On the day of his scheduled court appearance, August 24, 1994, Ullman committed suicide.

Two days later, James W. Abrams ("Abrams") was appointed Temporary Administrator of Ullman's Estate. Abrams testified in his deposition that he was aware of the criminal charges against Ullman and, upon his appointment, he went to the Ullman law office, had the locks changed and secured the files. He stated that the office was in considerable disarray; it looked like the "fall of Saigon." He reviewed all of Ullman's active files and sent letters to all of the active clients, his major concern being the running of statutes of limitations.

On August 29, 1994, Abrams faxed a letter to the insurance agency, Kronholm & Keeler, Inc., which stated:

> To Whom It May Concern:
>
> I have been appointed Temporary Administrator of the Estate of James M.S. Ullman, your insured on the above-referenced policy. I have reason to believe that claims may be made against the Estate, which may involve liability under the policy, and hereby give you notice of the existence of such claims.
>
> Please contact me at your earliest convenience.

This letter was forwarded by Kronholm & Keeler to American Home.

On that same day, Kronholm & Keeler wrote a letter to American Home, which bears the heading "First Report," and states that on August 25, 1994, they had seen "the enclosed newspaper article" regarding James M.S. Ullman, which "contains potential claims information which we are putting the company on notice of. Please give this your attention." The attached article reported that Ullman had taken his own life after he was arrested on charges of stealing $166,000 from a couple who had hired him to represent them at the closing of a mortgage refinancing. The article stated that, according to the detective's affidavit, the couple had given Ullman this money to pay off their old mortgage but, instead, Ullman had stolen the money and had attempted to cover up the theft through bad checks, wire transfers, and altered copies of checks. The article also mentioned ten grievances that had been filed with the Statewide Grievance Committee against Ullman and a dispute between Ullman and the State Department of Transportation ("DOT") over collections Ullman had performed for DOT but never remitted to DOT.

On August 30, 1994, Kronholm & Keeler again faxed the same newspaper clipping to American Home, stating on the cover sheet that "this is to put the co. on notice." On September 2, 1994, the agency sent another facsimile to American Home indicating that another potential claim against Ullman had been received and that all insurance information was being sent (presumably to the third party).

Defendant Falconeri has also submitted handwritten notes of William Powell, a professional liability claims adjuster with American Home, dated September 6 and 7, 1994, regarding "various claimants" under Ullman's "200/600 policy." His notes indicate that American Home was aware of Ullman's suicide, that they had received several claims, and that Abrams had been appointed the Temporary Administrator of the insured's estate. The memo concluded that this matter should be handled "as complex due to (1) multiple claims with potentially insufficient limits; (2) coverage issues including rescission potential." The memo noted Connecticut's "automatic 30 day ERP" (extended reporting period).

---

**5.** *See* Discussion at 346–348, *infra*.

Based on the communications to and from Kronholm & Keeler, American Home's agent, as well as Powell's interoffice memorandum, there can be no genuine issue of fact that, prior to the expiration of the policy period on September 8, 1994, American Home had notice of Ullman's death, the general circumstances surrounding it, and the potential for a number of professional liability claims being filed against the policy.

On September 15th and 16th, additional facsimiles were sent from the Kronholm & Keeler agency to American Home regarding the Ullman policy and claims.

It was not until September 20, 1994, however, that American Home responded to Abrams' initial letter. Lucy Ann Galioto, Director, LPL Claims Department, wrote:

> Please be advised that pursuant to the above referenced policy your letter does not constitute sufficient notice of claim. Specifically, said policy provides in pertinent part: ... Upon the Insured's becoming aware of any act, error or omission which could reasonably be expected to be the basis of a claim or suit covered hereby, written notice shall be given by or on behalf of the insured to the Company or any of its authorized agents as soon as practicable during the policy period or extended reporting period, together with the fullest information obtainable ...
>
> Therefore, I ask that you provide me with a description of the claim including, but not limited to: the identity of claimant; the nature of his/her complaint and date which may be relevant to same.

On October 17, 1994, Abrams sent a detailed, two-page letter to Ms. Galioto expressing his concern over American Home's assertion of a notice defense to claims being made under the policy. Abrams demanded that American Home cease denying the claims and provide a defense under a reservation of rights and that American Home permit the Estate to purchase extended reporting period coverage.[6] American Home never responded to Abrams' request for extended reporting coverage.[7] American Home states, however, that, at this point, it had extended the reporting period sixty (60) days, as required by New York law.[8]

Ultimately, approximately seventy-five (75) claims were asserted against Ullman's Estate, totaling over $1.6 million, a number of which were paid. The instant lawsuit concerns only the claims filed by the Estate of Stergius and the Estate of Montemurro.[9]

### Claims of the Stergius Estate

Anthony K. Stergius, and later his Estate, had been represented by Attorney Ullman for several years prior to Ullman's death. From July 6, 1993, until November 2, 1993, when Mr. Stergius died, Ullman served as the Conservator of the Estate and of the Person of Stergius. On November 22, 1994, Louis J. Martocchio, Esq., was appointed as the Temporary Administrator of the Estate of Anthony K. Stergius. Upon his appointment, he undertook an investigation to locate all assets of the Estate. He determined that Ullman had closed eight bank accounts belonging to Stergius and had withdrawn approximately

---

6. See Discussion at 350–352, infra.

7. There is a dispute between the parties as to whether this letter from Abrams was ever sent to American Home. Only an unsigned copy has been produced and American Home claims to have no record of having received this letter and claims not to have a copy in its files.

8. American Home states in its Memorandum in Support of its Motion for Summary Judgment that Connecticut provides a 30–day automatic extended reporting period, C.G.S.A. § 38a–394, but that New York applies a 60–day period, N.Y.Comp.Codes R. & Regs. tit. 11, § 73.3(d) (1995). "American Home applied the more generous New York statute." (Pl.'s Mem. at 8 n. 4). It is unclear why American Home decided to apply the longer extended reporting period, other than perhaps the fact that American Home was a New York corporation.

9. See Note 3, supra.

$416,000 from these accounts. Additionally, other assets were missing from the Estate. On February 24, 1995, Martocchio filed a proof of claim against the Ullman Estate. On September 29, 1995, Salvatore J. Falconeri was appointed as the Administrator of the Stergius Estate.

On March 26, 1996, Attorney James B. Streeto, on behalf of Falconeri, wrote Abrams regarding a legal malpractice claim against Ullman's Estate and requested information regarding Ullman's malpractice carrier. On March 28, 1996, Abrams sent American Home a copy of his response to Streeto, acknowledging the malpractice claim asserted by Streeto on behalf of the Stergius Estate. This was the first notice to American Home of a claim by the Stergius Estate against Ullman. On April 8, 1996, Galioto responded to Abrams' letter, denying the Stergius claim on the basis of late notice.

The Stergius Estate then instituted a state court action against Abrams in his capacity as Administrator of Ullman's Estate, alleging professional negligence and malpractice, and breach of fiduciary duty. The first count alleged, *inter alia*, that Ullman had failed to exercise reasonable care, skill and diligence on behalf of his client Stergius and was negligent in failing to provide competent representation; in failing to abide by his client's decisions and in failing to consult with his client; in engaging in transactions in which Ullman acquired pecuniary interests adverse to those of his client without disclosing these interests; acting contrary to the best interests of his client whom he knew to be impaired; in failing to segregate the client's funds from his own property; and in failing to disclose transfers of property from the client's Estate, which transfers were adverse to the client's Estate. The second count alleged, *inter alia*, that Ullman as Conservator had breached fiduciary duties owed to Stergius and was negligent in failing to manage Stergius' Estate to preserve the income and principal of the Estate; in failing to make required filings with the probate court including an accurate inventory and appraisals of the prop-

erty of the Estate; in failing to accurately maintain Stergius' bank accounts; in failing to make periodic accountings; in failing to exercise proper and sound judgment to maintain and maximize the assets of the Estate; in improperly withdrawing or borrowing money from the Estate; and in making improper disbursements from the Estate.

Four days later, American Home brought this declaratory judgment action.

The Ullman Estate, which by this time was virtually insolvent, did not appear to defend the state court action and a default was entered on September 23, 1996. On December 20, 1996, the state court entered judgment in favor of Stergius' Estate in the amount of $415,830.62. American Home was given notice of the judgment and was provided with a demand to satisfy the judgment. American Home refused to provide a defense or satisfy the judgment on the grounds of late notice.

### Claims of the Montemurro Estate

Robert Montemurro, as Executor of the Estate of Angeline C. Montemurro, filed suit against Abrams as Administrator of Ullman's Estate. The complaint alleged that Ullman, who had represented Robert Montemurro in connection with the probate of the Estate of Angeline C. Montemurro from February 15, 1994, until Ullman's death, had misappropriated $156,858.91 from the Estate. This money was payable to the heirs of Angeline Montemurro, but instead had been deposited into Ullman's personal bank account. The complaint asserted claims for professional negligence, breach of contract, and violation of CUTPA by virtue of Ullman's intentionally, purposefully and fraudulently depositing these funds into his own account. On July 18, 1997, Abrams sent American Home a letter enclosing a Motion to Set Aside Judgment of Dismissal, served upon him as representative of the Ullman Estate, requesting that American Home assume the defense of this matter under Ullman's policy. American Home refused to provide a defense.

## DISCUSSION

In this declaratory judgment action, American Home asks this Court to declare: (1) that the claims of the Stergius Estate and Montemurro Estate were not made and reported within the policy period or any extended reporting period and, thus, are not covered by the policy; (2) that there is no coverage under the policy for these claims because they do not allege "damages" within the meaning of the coverage provision and, therefore, are not insurable; (3) that these claims are excludable under the policy, which does not apply to claims arising out of criminal acts, errors or omissions or claims arising out of dishonest, fraudulent, or dishonest acts, committed with actual dishonest, fraudulent or malicious purpose or intent; and (4) that it is entitled to a rescission of the policy based upon material misrepresentations and omissions made by Ullman in his application for the policy. As noted above, defendants Abrams and Falconeri have filed Counterclaims, all arising out of American Home's refusal to provide coverage for these claims.

### I. Timeliness of the Notice of Claims

American Home first asserts that neither the claim of the Stergius Estate nor the claim of the Montemurro Estate was "made and reported" pursuant to the terms and conditions of the lawyer's professional liability policy issued to James M.S. Ullman, P.C., so as to trigger coverage prior to the expiration of the policy period on September 8, 1994, or within the sixty-day extended reporting period provided by New York law. Defendants respond that American Home had abundant "notice," as that term is defined by the policy, of these claims prior to November 7, 1994. Moreover, they assert that American Home should be estopped from denying coverage on the ground of lack of

notice because it never complied with the statutory and regulatory requirements regarding the extended reporting period— *i.e.* it never advised Abrams of the automatic extended reporting period under New York or Connecticut law nor of the availability of, and the importance of, purchasing extended reporting period coverage. Indeed, defendants argue that, when Abrams demanded the right to purchase extended reporting coverage, as provided by the insurance contract, American Home never responded.

A critical aspect of this case is the distinction between a "claims-made" policy and an "occurrence" policy. The policy at issue is a "claims-made," [10] or more specifically, a "claims-made and reported" policy, where coverage is generally afforded for claims first made against the insured and reported to the company during the policy period (and any extended reporting period), even when the event causing the harm occurred prior to the policy period. *See generally Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 771, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Andy Warhol Foundation for Visual Arts, Inc. v. Federal Ins. Co.,* 189 F.3d 208 (2d Cir.1999); *Evanston Ins. Co. v. Affiliated FM Ins. Co.,* 556 F.Supp. 135, 138 (D.Conn.1983). The essence of a claims-made policy is notice to the carrier within the policy period. *See Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 So.2d 512, 514 (Fla.1983). Such a policy has the distinct advantage for the insurer of providing certainty that, when the policy period ends without a claim having been made, the insurer will be exposed to no further liability. The insurer can better set "reserves" for potential losses. A claims-made policy also minimizes disputes with subsequent insurers as to when an "occurrence" took place. *See generally Thoracic Cardiovascular As-*

10. The Connecticut Insurance Department Regulations define a "claims-made policy" as "an insurance policy ... that covers liability for injury or damage that the insured is legally obligated to pay (including injury or damage occurring prior to the effective date of the policy, but subsequent to the retroactive date, if any), arising out of incidents, acts or omissions, as long as the claim is first made during the policy period or any extended reporting period." Conn. Agencies Regs. § 38a–327–1(a).

*socs., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 181 Ariz. 449, 891 P.2d 916, 919–20 (App.1994). Of course, the major drawback from the insurer's standpoint is that it may face exposure for wrongful acts performed in the past, not just during the policy period, and, therefore, it is not uncommon for the policy to limit the time period of coverage for prior acts by including a retroactive date.[11]

■ In contrast, an "occurrence" policy protects the insured from liability for any act done while the policy is in effect. *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). Coverage depends on when the negligent act or omission occurred, not when the claim was asserted. The giving of notice is only a condition of the policy. *Id.* The major drawback of an "occurrence" policy is the lengthy and unpredictable "tail" [12] of liability, since there is no defined time when coverage ends. *Thoracic Cardiovascular Assocs.,* 891 P.2d at 919.

American Home's Policy No. LPL 7053308 provided coverage for "all sums which the insured shall legally become obligated to pay as damages because of any claim or claims ... *first made against the insured and reported to the Company during the policy period or extended reporting period....* " (Policy at 1, ¶ I).[13] The policy then defined "claim" as "a demand received by the *insured* for money or services including the service of suit or institution of arbitration proceedings against

---

**11.** Although not an issue in this case, the policy limited coverage to prior acts, errors and omissions occurring on or subsequent to September 8, 1992.

**12.** A "tail" is the time lapse between the date of the negligent act or omission and the time when a claim is made. *Gulf Ins. Co.,* 433 So.2d at 515.

**13.** The policy contained an insuring agreement obligating American Home to provide the following coverage:
   **I. Coverage**
   To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any

---

the insured." (Policy at 4, ¶ I(e)) (emphasis added). According to the policy language, a claim is first made against the insured during the policy period if

> during the policy period or extended reporting period the insured shall have knowledge or become aware of any act, error or omission which could reasonably be expected to give rise to a claim under this policy and shall during the policy period or extended reporting period give written notice thereof to the Company in accordance with Condition IX.
>
> ...
>
> *A claim shall be considered to be reported to the Company when the Company, or its authorized agent, first receives written notice of the claim or of an event which could reasonably be expected to give rise to a claim.*

(Policy at 2–3) (emphasis added). The policy further provided with respect to "notice":

**IX. Notice of Claim or Suit**

*Upon the insured's becoming aware of any act, error or omission which could reasonably be expected to be the basis of a claim or suit covered hereby, written notice shall be given by or on behalf of the insured to the Company* or any of its authorized agents as soon as practicable during the policy period or extended reporting period, together with the fullest information obtainable....

> claim or claims, including claim(s) for personal injury, *first made against the insured and reported to the Company during the policy period or extended reporting period,* arising out of any act, error or omission of the insured in rendering or failing to render professional services for others in the insured's capacity as a lawyer, fiduciary or Notary Public, and caused by the insured or any other person for whose acts, errors or omissions the insured is legally responsible, except as excluded or limited by the terms, conditions and exclusions of this policy.
> (Policy at 1, ¶ I) (emphasis added).

*If during the policy period or the extended reporting period, the Company shall be given written notice of any act, error or omission which could reasonably be expected to give rise to a claim or suit against the insured under this policy, any claim which subsequently arises out of such act, error or omission shall be considered to be a claim reported during the policy period or extended reporting period in which the said written notice was so received.*

(Policy at 6) (emphasis added).

In the instant case, American Home argues that it did not receive "notice" of the Falconeri and Montemurro claims within the policy period and, therefore, there is no coverage. American Home focuses on the definition of "claim" and argues that no "claim" was made by Falconeri or Montemurro against Ullman or Abrams, as neither made any sort of demand for money or services, within the policy period, and, ergo, there can be no coverage. On the other hand, defendants focus on the policy language that a claim is considered reported to the company when the company first receives "written notice of the claim or *an event which could reasonably be expected to give rise to a claim*" and cite the August 24, 1994 letter sent by Abrams to Kronholm & Keeler as the requisite "notice." They further assert that American Home had received information from multiple sources prior to the expiration of the extended reporting period, informing it of an event "which could reasonably be expected to give rise to a claim," that the notice was provided "as soon as practicable" and with the "fullest information obtainable" at that time. American Home responds that this vague letter from Abrams effectively gave it notice of nothing and did not constitute notice of a claim. To adopt defendants' position, it argues, would be to transform this "claims-made" policy into an "occurrence" policy, although it concedes that the policy is not so restrictive as to mandate that an actual claim must be made against the insured before notice can be given that would trigger coverage under the policy.

Generally, the interpretation of an insurance contract is a matter of law to be decided by the Court. *Imperial Cas. & Indem. Co. v. State*, 246 Conn. 313, 322 & n. 6, 714 A.2d 1230, 1236 (1998). As the Second Circuit has recently discussed in *Andy Warhol Foundation*, 189 F.3d 208, 213, an insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain and ordinary meaning of the policy's terms. *See also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990); *Imperial Cas.*, 246 Conn. at 324, 714 A.2d 1230. If the language of the policy, when viewed in its entirety, is unambiguous, the Court will apply its terms. If its terms are reasonably susceptible to more than one interpretation, the policy is considered to be ambiguous, and the Court must then consider extrinsic evidence, if any, to ascertain the intent of the parties. If, as is often the case, the ambiguities cannot be resolved in this manner, then the policy should be construed to give effect to the reasonable expectations of the insured at the time he entered into the contract. In such situations, ambiguities are generally construed in favor of coverage and against the insurance company, which drafted the policy and, thus, is responsible for the ambiguity. *See Coregis Ins. Co. v. Goldstein*, 32 F.Supp.2d 508, 512 (D.Conn.1998).

In this case, were we to consider only the language of the insuring agreement and the definition of "claim," we would agree with American Home's position that there is no coverage because a "claim" was not made against the Ullman Estate by Falconeri or Montemurro within the policy period. This position, however, overlooks the basic tenet of contract construction that an insurance policy must be read in its entirety. *See Imperial Cas.*, 246 Conn. at 324, 714 A.2d 1230. As defendants point out (and as American Home seems to concede at a later point in its brief), if an insured put American Home on notice of an act, error or omission that could reasonably be anticipated to give rise to a claim

by Falconeri or Montemurro, and a claim was subsequently made arising out of that act, error or omission, that claim would be covered. The question then becomes whether American Home was put on notice of an act, error or omission that could reasonably be expected to give rise to these claims under the policy and, if so, whether Falconeri's and Montemurro's claims can to considered as arising out of such act, error or omission.

■ Abrams' initial letter did not put the company on notice of any act, error or omission. It merely expressed his concern that claims might arise. It did not explain the circumstances surrounding Ullman's death, or the criminal charges against Ullman, or provide any other explanation as to why he had "reason to believe that claims may be made against the Estate." However, that same day, American Home's agent, Kronholm & Keeler wrote American Home with a copy of the newspaper article "containing potential claims information" and "putting the company on notice." Thereafter, several claims were in fact filed. Consequently, before the expiration of the policy period and extended reporting period, American Home had been put on notice that Ullman had been criminally charged with embezzling clients' funds and that a number of other claims had been filed against him, and that it was likely that there would be other claims. American Home's own agent prepared a memo indicating that several claims had already been filed and noting the possibility of "multiple claims." Significantly, however, there is absolutely no evidence in the record that American Home had notice of a potential claim by the Stergius Estate or the Montemurro Estate or any act or omission by Ullman with respect to these two Estates which might reasonably be expected to give rise to a claim.

It is undisputed that Mr. Martocchio, as Temporary Administrator of the Stergius Estate, did not file a proof of claim with Abrams until February 24, 1995, and that the first notice of a claim by the Stergius Estate was a March 28, 1996, letter from Abrams, enclosing his response to Streeto's letter regarding the possibility of a malpractice claim. This was eighteen (18) months after the termination of the policy.

The first notice to American Home of a claim or potential claim by Montemurro was not until July of 1997, when Abrams forwarded to American Home a letter enclosing a motion to set aside a judgment of dismissal in the state court action filed by Montemurro against Abrams, as Administrator of Ullman's Estate. By this time, thirty-four (34) months had elapsed since the termination date of the Ullman policy.

To adopt defendants' position that Abrams' initial letter provided notice of these claims would be to open the doors of coverage to all professional liability claims asserted against Ullman's Estate, regardless of when the claims were made, in essence turning this claims-made policy into an occurrence policy. *See generally Thoracic Cardiovascular Assocs.*, 891 P.2d at 922 (refusing to hold that the reporting requirement in a claims-made policy should be excused when a claim was not discovered during the policy period); *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 324, 495 A.2d 395, 406 (1985) (holding that an extension of the notice period in a claims-made policy would constitute an "unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy"); *Gulf Ins. Co.*, 433 So.2d at 515 (holding that, if a court were to allow an extension of the reporting time after the end of the policy period, such would be tantamount to an extension of coverage to the insure, gratis). There is nothing in the insurance contract that would allow such a broad interpretation of the notice requirement. Notice of a claim or of an event that could reasonably be expected to give rise to a claim was a material and fundamental limitation on the coverage provided by American Home's claims-made policy. *See generally Slater v. Lawyer's Mut. Ins. Co.*, 227 Cal.App.3d

1415, 1422, 278 Cal.Rptr. 479, 483–84 (1991). The terms of the policy are unambiguous in this regard. *See Thoracic Cardiovascular Assocs.*, 891 P.2d at 923, *and Lloyd v. Ichinose,* —— So.2d ——, ——, No. 98–CC–2157, 1999 WL 694715, at *4 (La. Sept.8, 1999) (discussing the caselaw on whether use of the term "claim" in two different contexts, *i.e.* a claim made to the insured and notice of a claim to the insurer, is ambiguous, and finding that the weight of authority supports a finding of no ambiguity).

We find as a matter of law that American Home was not given timely notice of the claims of Falconeri and Montemurro or of an event that could reasonably be expected to give rise to these claims.

## II. Estoppel

Our inquiry does not end here, however, for we must next consider the argument of defendants that American Home should be estopped from denying coverage because of its failure to comply with the statutory and regulatory requirements concerning extended reporting period coverage. *See generally Bouchard v. Travelers Indemnity Co.*, 28 Conn.Supp. 122, 253 A.2d 497 (Conn.Super.1969). Defendants argue that American violated Connecticut law by failing to notify Abrams of his right to purchase extended reporting period coverage and by failing to respond to Abrams' demand that he be allowed to purchase the extended reporting coverage. Clearly, this was exactly what Abrams needed to do to protect Ullman's Estate.

Under Connecticut law, all professional liability policies issued on a claims-made basis are required to provide an automatic extended reporting period of at least thirty (30) days upon termination of coverage, Conn. Agencies Regs. § 38a–327–3(b), and must contain a contractual right of *"the insured"* to purchase at any time during the policy period or for thirty (30) days after termination of the policy equivalent coverage for all claims occurring during the policy period regardless when made. C.G.S.A. § 38a–394. Under the Regulations, the insurer must

advise the *named insured* in writing of the automatic extended reporting period coverage and the availability of, the premium for and importance of purchasing additional extended reporting period coverage. This advice must be sent no earlier than the date of notification of termination of coverage nor later than fifteen (15) days after termination of coverage.

Conn. Agencies Regs. § 38a–327–3(d)(3). The named insured then has the greater of thirty (30) days from the effective date of termination of coverage or fifteen (15) days from the date of mailing or delivery of the advice to submit written acceptance of additional extended reporting period coverage. Conn. Agencies Regs. § 38a–327–3(d)(4). The Regulations also specify the amount of coverage that must be offered, which for a professional liability policy, is unlimited extended reporting period coverage. Conn. Agencies Regs. § 38a–327–3(d)(6)(A).

There is no evidence in the record that American Home ever gave Abrams notice of the right to purchase extended reporting period coverage and American Home does not contend otherwise. American Home's response is that it was not required to do so because the Regulations only require notice to the "named insured" and neither Abrams nor Ullman's Estate was a named insured.

In this case, the only "Named Insured" was James M.S. Ullman, P.C. The policy then included as "Persons Insured," "any lawyers who are stockholders or members thereof," (subsection (c)), if the named insured is a professional corporation, thus covering James Ullman. The policy further provided that "Persons Insured" included the estate and administrator of any insured in the event of such insured's death, but only to the extent that such insured would otherwise be provided coverage under the policy. (Subsection (h)). Thus, Ullman's Estate and Abrams, as the Administrator, were "Persons Insured."

■ The extended reporting endorsement then provided that in the event of cancellation or non-renewal of the policy by either the Named Insured or the Company, "an insured as defined in (a), (b), or (c) of the Persons Insured Section has the right, upon payment of the appropriate additional premium, to have issued an endorsement providing extended reporting period coverage." [14] Under the policy, the right to purchase extended reporting period coverage extended only to James Ullman (included in subsection (c)) but not to his Estate or to Abrams (included in subsection (h)).

We hold that this provision violates the Connecticut statute governing *"mandatory* provisions for claims-made policies," which does not limit the right to purchase extended reporting period coverage to the named insured. The statute mandates that every professional liability policy issued on a claims-made basis must contain a contractual right "of the insured" [15] to purchase extended reporting period coverage. This would encompass Ullman's Estate and Abrams, as Administrator, who were insureds under the policy and logically should be included, since upon an insured's death, his or her estate might well need the protection of extended reporting period coverage. Thus, based upon the requirement of the Connecticut statute governing "mandatory" provisions in claims-made policies, we hold that Abrams had the right to purchase extended reporting period coverage and that American Home, by the terms of its policy, could not curtail that right. Indeed, American Home's policy specifically provided that the "[t]erms of this policy which are in conflict with the statutes of the State wherein this policy is issued are hereby amended to conform to such statutes." (Policy at 7, ¶ XVII).

■ Defendants next assert that American Home violated the Regulations by failing to advise Abrams in writing of the availability of extended reporting period coverage, the cost thereof, and the importance of purchasing this coverage. The requirement of written notice is not addressed in the statute. The Regulations specifically refer to the "named insured." Conn. Agencies Regs. § 38a–327–3(d)(3). There is no requirement that the insurance company provide this written notice to all "persons insured" or "other insureds" under the policy. This is a logical distinction because generally the declaration page of a policy will list the named insured and his or her address, but the policy may not even specifically name the "other insureds" or "persons insured," referring to them only categorically as was done in this case. Thus, it makes sense that the insurer would be required to give written notice to the named insured but not necessarily to all "persons insured." We hold that, under the Regulations, American Home was not required to send notice to Abrams of his right to purchase extending reporting period coverage.

■ In this case, the availability of extended reporting period coverage was set forth in the professional liability policy, including the cost for such coverage. Under Connecticut law, the insured is

---

14. Under the Extended Reporting Endorsement to the policy, any "insured" under subsections (a), (b), or (c) of the Named Insured Section had the right, upon payment of an additional premium, within 30 days of the termination of the policy, to have issued an endorsement providing an extended reporting period for all claims first made against the insured and reported to the company after the termination of the policy period arising out of any act, error, or omission occurring prior to the termination of the policy period and otherwise covered by the policy. The additional premiums were:

(a) for 225% of the Named Insured's last annual premium, an unlimited extended reporting period;
(b) for 150% of the last annual premium, a six-year extended reporting period;
(c) for 100% of the last annual premium, a three-year extended reporting period.
Policy at p. 5, ¶ VI.

15. "Insured" is defined as "a person to whom or for whose benefit an insurer makes promise in an insurance policy." C.G.S.A. § 38a–1(12).

charged with knowledge of the terms and conditions of the policy. *Western World Ins. Co.*, 922 F.2d at 122. Apparently, Abrams was aware, or became aware, of the availability of this coverage for he wrote American Home on October 17, 1994, demanding that American Home permit the Estate to purchase extended reporting period coverage. As noted above, there is a dispute as to whether American Home ever received this letter. However, assuming that it did, this letter was dated more than thirty (30) days after the termination of policy. Although American Home had voluntarily extended the reporting period for a period of sixty (60) days, pursuant to New York law, Abrams' statutory right under Connecticut law to purchase extended reporting period coverage had expired on October 8, 1994, thirty (30) days after the policy terminated. In fact, even the extended reporting period endorsement of the policy required that the extended coverage be purchased within thirty (30) days of the termination of the policy. American Home's gratuitous extension of the reporting period did not perforce extend the time for purchasing extended reporting period coverage under the policy or under Connecticut law.

■■■■ Therefore, although American Home never responded to his demand to purchase this extended coverage, we find that this lack of response did not violate the statute or regulations. By the time Abrams made the demand, he no longer had the right to purchase this extended coverage. Thus, we hold that American Home had no statutory duty to provide Abrams with written notice of the Estate's right to purchase extended reporting period coverage and that its failure to do so does not estop American Home from denying coverage for these claims.[16]

### CONCLUSION

Accordingly, we hold that American Home's Professional Liability Policy No. 7053308 did not provide coverage for the claims of the Stergius Estate or the Montemurro Estate because timely notice of these claims (or of events that reasonably could be anticipated to give rise to these claims) was not provided to American Home. Having so held, we need not reach the merits of American Home's alternative arguments (1) that these claims are not covered because they do not allege "damages" within the meaning of the policy; (2) that these particular claims were excluded under the policy because they arose either out of a criminal act, error or omission of Ullman, or out of a dishonest, fraudulent or malicious act, committed with actual dishonest, fraudulent, or malicious purpose or intent; or (3) that it is entitled to rescind the policy based upon material misrepresentations made by Ullman or his failure to disclose material facts in the application, including the fact that he was not aware of any circumstances which might result in a claim.

Therefore, we GRANT the Motion for Summary Judgment of American Home [**Doc. # 51**] to the extent that we declare as a matter of law that the claims-made by defendant Falconeri, on behalf of the Stergius Estate, and the claims-made by Montemurro, on behalf of the Montemurro Estate, are not covered by Lawyer's Professional Liability Policy No. 7053308, because these claims were not reported to American Home during the policy period or any automatic extended reporting period (Counts I and III of the Amended Complaint). Having found in favor of American Home on Counts I and III, the alternative Counts, IV, VI, VII, IX, X, XI, and XII are DISMISSED. We DENY the Cross–Motion of defendant Falconeri on behalf of the Stergius Estate [**Doc. # 63**]

---

16. Connecticut law provides that an insurer's failure to timely deny coverage or raise defenses based upon the insured noncompliance with the policy's conditions may estop the insurer from exercising its right to disclaim coverage if the insured is prejudiced by such delay. *Town of Andover v. Hartford Accident & Indem. Co.*, 153 Conn. 439, 444, 217 A.2d 60, 63 (1966).

and DISMISS the Counterclaims of defendants Abrams and Falconeri. The Clerk is directed to enter Judgment accordingly and to close this file.

**SO ORDERED.**