151 P.3d 538

**LENNAR CORPORATION, a Delaware corporation; Lennar Homes of Arizona, Inc., an Arizona corporation; Lennar Communities Development, Inc., a Delaware corporation, Defendants, Counterclaimants, Cross Claimants, Third Party Plaintiffs, Appellants,**

v.

**AUTO–OWNERS INSURANCE COMPANY, a corporation, Third Party Defendant, Cross Claim Defendant–Appellee.**

United States Fire Insurance Company, Defendant, Crossdefendant, Counter defendant-Appellee,

v.

Lennar Corporation, a Delaware corporation; Lennar Homes of Arizona, Inc., an Arizona corporation; Lennar Communities Development, Inc., a Delaware corporation, Defendants, Crossclaimants, Third Party Plaintiffs–Appellants.

Transamerica Insurance Company n/k/a TIG Insurance Company; United States Fidelity & Guaranty Company, Plaintiffs, Counter defendants-Appellees,

v.

Lennar Corporation, a Delaware Corporation; Lennar Homes of Arizona, Inc., and Arizona Corporation; Lennar Communities Development, Inc., a Delaware Corporation, Defendants, Counter claimants-Appellants.

Lennar Corporation, a Delaware corporation; Lennar Homes of Arizona, Inc., an Arizona corporation; Lennar Communities Development, Inc., a Delaware corporation, Third Party Plaintiffs, Cross claimants-Appellants,

v.

United National Insurance Company, Third Party Defendant, Cross Claim Defendant–Appellee.

Lennar Corporation, a Delaware corporation; Lennar Homes of Arizona, Inc., an Arizona corporation; Lennar Communities Development, Inc., a Delaware corporation, Defendants, Counterclaimants, Cross claimants, Third–Party Plaintiffs–Appellants/Cross Appellees,

v.

**Fidelity and Guaranty Insurance Company; and St. Paul Fire & Marine Insurance Company, Defendants–Appellees/Cross Appellants.**

Nos. 1 CA–CV 03–0451, 1 CA–CV 03–0593, 1 CA–CV 03–0715, 1 CA–CV 03–0804, 1 CA–CV 04–0327.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 23, 2007.

Fennemore Craig P.C. By John J. Balitis, Jr., Timothy Berg, Phoenix, and Payne & Fears LLP By Scott S. Thomas, J. Kelby Van Patten, Sean P. Reis, California, Attorneys for Defendants, Counterclaimants, Cross–Claimants, Third Party Plaintiffs–Appellants.

Campbell, Volk & Lauter By Ronald J. Lauter, Phoenix, Attorney for Third Party Defendant, Cross–Claim Defendant–Appellee.

Broening Oberg Woods & Wilson P.C. By Terrence P. Woods, Marilyn D. Cage, Phoenix, Attorneys for Defendant, Crossdefendant, Counterdefendant–Appellee.

Burke Panzarella Rich By Thomas P. Burke, Armanda M. Lorenz, Phoenix, and Harrington Foxx Dubrow & Canter, By Mark W. Flory, Marianne Fratianne, Vickie V. Grasu, California, Attorneys for Plaintiff, Counterdefendants–Appellees.

David Bell & Associates PLLC By David M. Bell, Phoenix, Attorney for Third Party Defendant, Cross–Claim Defendant–Appellee.

Harper Christian Dichter & Graif PC By Douglas L. Christian, Gena L. Sluga, Phoenix, Attorneys for Defendants–Appellees/Cross–Appellants.

Oliva & Associates ALC By Joseph L. Oliva, California, Attorney for Amicus Curiae—Woodside Homes and Mirage Home Construction.

Gallagher & Kennedy Phoenix By Kevin M. O'Malley, Trevor H. Chait, Jeffrey B. Kaykendell, Phoenix, Attorneys for Amicus Curiae Home Builders.

## OPINION

SNOW, Judge.

¶ 1 Lennar Corporation, Lennar Homes of Arizona, Inc., and Lennar Communities Development, Inc. (collectively "Lennar") bring this consolidated appeal from the trial court's summary judgment to various insurers in a declaratory judgment action. In the judgments, the trial court determined that the insurers had no obligation to defend Lennar in a suit brought against it by homeowners in its Pinnacle Hill Development. Because we

determine that Lennar was not a named insured on the policy that United National Insurance Company ("UNIC") issued to Wheeler Construction ("Wheeler"), we affirm the trial court's summary judgment as to UNIC on that policy. For all other insurers, we determine that the operative Pinnacle Hill complaint, in conjunction with the affidavits and other information set forth by Lennar, sufficiently alleges an "occurrence" that may give rise to coverage under the insurance policies. We thus reverse and remand the judgments entered on those policies and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Lennar is a residential home developer. It oversaw the development of 105 homes in the Pinnacle Hill residential development in Glendale, Arizona. Lennar did not actually perform any of the construction at Pinnacle Hill. Rather, it subcontracted with various companies to perform the actual construction. Before construction began, Lennar hired a firm to perform a geotechnical evaluation of the soils. That firm's report indicated that the soils were subject to expansion and settlement if exposed to excessive moisture. Lennar eventually submitted an application to the Arizona Department of Real Estate stating that the soils were not subject to expansion, and the department issued a public report reflecting that information. Construction of the homes went forward, and the homes were completed between December 1993 and September 1995.

¶ 3 In December 1993, homeowners began complaining to Lennar of various problems in their homes, including drywall cracking. Lennar performed "investigative repairs." On September 8, 1998, Lennar homeowners Christopher and Robin Cioffi sued Lennar, alleging breach of implied warranty, breach of contract, negligent misrepresentation, consumer fraud and negligence. The negligence count alleged that Lennar "negligently oversaw and supervised the construction of the Residence and/or negligently constructed the

Residence by causing it to be constructed on expansive soil." The complaint alleged property damage including wall cracks, tile grout cracks and separation, baseboard separation and sticking doors.[1] After being served with the complaint, Lennar tendered the defense of the suit to the insurers from which it had obtained general liability policies.[2]

¶4 In January 1999, the Pinnacle Hill plaintiffs amended their complaint and alleged that Lennar had promised to "construct the Residence, including the underlying real property which is part of the Residence, in a good and workmanlike manner in substantial accord with the plans and specifications on file." It amended the negligence count to allege that Lennar "negligently constructed the Residence, including the underlying real property which is part of the Residence." The amended complaint also added causes of action for fraud, fraudulent concealment, negligence per se and liability of a parent corporation. After the amended complaint was filed, Lennar also tendered the defense of the suit to its subcontractors' insurers, alleging that because it was an additional insured under those subcontractors' policies, the subcontractors' insurers were obliged to provide it a defense.[3] The negligence allegations in the Second Amended Complaint, which is the complaint at issue, are essentially the same allegations as

those included in the First Amended Complaint.

¶5 Additionally, at approximately this time, Lennar hired Roel Consulting Group to investigate the problems at Pinnacle Hill, determine the cause of the property damage and implement a remediation plan to prevent further damage to the homes. After inspection and testing, Roel and its consultants concluded that the primary cause of damage to the Pinnacle Hill homes was deficient work by various subcontractors. Of relevance to this appeal, it concluded that Wheeler, the rough grader, failed to properly compact fill soil, provide adequate draining and build non-expansive building pads. It further concluded that Morrison, the framing subcontractor, inadequately secured the exterior walls, improperly fastened the interior walls, and failed to install adequate backing for the stucco and drywall, and that Metro Drywall, the drywall subcontractor, failed to attach the drywall to an adequate backing and concealed the deficiencies of other subcontractors' work.[4]

¶6 In October 1999, the Pinnacle Hill plaintiffs disclosed that they had retained an expert, Randy Marwig, who had evaluated the soils at Pinnacle Hill and discovered that the soils were expansive. One month later, Marwig acknowledged in his deposition that his initial report, in which he had attributed the property damage to soil subsidence, had assumed that the homes were constructed in

1. Between September 1998 and May 1999, several additional homeowners filed complaints that were consolidated into this lawsuit in May of 1999 by the Second Amended Complaint. Additional lawsuits were also filed between December 2000 and March 2001. We hereafter refer to these lawsuits collectively as "the Pinnacle Hill lawsuit."

2. Parties to this appeal from which Lennar purchased policies include TIG Insurance Company ("TIG"), United States Fidelity & Guaranty Company ("USF & G") and United States Fire Insurance Company ("U.S.Fire"). TIG issued commercial general liability ("CGL") insurance policies to Lennar for the policy periods from June 1, 1993 through June 1, 1995. USF & G issued an excess liability policy to Lennar for the policy period from June 1, 1995 through June 1, 1996. U.S. Fire issued a CGL policy to Lennar for the policy period June 1, 1996 through June 1, 1997. These policies each have a self-insured retention of $250,000.

3. Parties to this appeal that provided policies to Lennar's subcontractors at material times include UNIC, Fidelity Guarantee Insurance Company ("FGIC") and Auto–Owners Insurance Company ("Auto–Owners"). Fidelity and Guaranty Insurance Underwriters ("FGIU") is not a named party, but it provided an insurance policy, on which Lennar is an additional insured, to Metro Drywall, one of Lennar's subcontractors. Lennar asserts that FGIC may be the appropriate party to defend claims brought against FGIU's policy.

4. Wheeler had an occurrence policy issued by UNIC for the period from July 1, 1994 to July 1, 1995, and an occurrence policy issued by FGIC for the period from July 1, 1998 to July 1, 1999. Morrison had an occurrence policy issued by Auto–Owners effective from February 5, 1999 to February 5, 2000, and Metro Drywall was insured by FGIU from July 1, 1998 to July 1, 2000.

accordance with the plans and specifications. Marwig further stated that he now believed that not to be the case and that this could potentially cause him to reassess whether the problems were "the result of expansive soil movements or the result of construction deficiencies or structural inadequacies...." He explicitly stated that there may be "specific deficiencies which may be either made worse or created by the construction deficiencies ... even in the absence of soil movement."

¶ 7 In March and April 2000, Lennar arranged meetings between its attorneys and the various insurers. In the meetings Lennar detailed the nature and extent of the damages to the homes and presented the results of the Roel investigation.[5] Lennar's experts also explained their view of how and why the subcontractors were at fault for the damages to the homes and that consequently the insurers were obligated to defend and indemnify Lennar. Lennar subsequently wrote a letter to the insurers reiterating this information. Additionally, it provided the insurers with copies of Marwig's deposition testimony, which, Lennar contends, indicates his agreement that the subcontractors' negligence could have caused or contributed to the damages.

¶ 8 Although none of the insurers provided Lennar with a defense to the Pinnacle Hill lawsuit, two insurers filed a declaratory relief action to determine whether they had a duty to defend Lennar and whether other insurers had a similar obligation. In addition to its answer, Lennar filed counter-claims, cross-claims and a third-party complaint in which it alleged breach of contract and tortious bad faith against each insurer for refusing to provide a defense. The trial court subsequently bifurcated the bad faith issues from the duty to defend issues and stayed all discovery and disclosures relating to bad faith.

¶ 9 Over the course of several months, each insurer filed a motion for summary judgment alleging at a minimum that it had no duty to defend Lennar against the Pinnacle Hill lawsuit. The trial court ultimately granted summary judgment in favor of each insurer as to all claims, including the bifurcated bad faith issues.[6]

¶ 10 Lennar timely appealed each judgment with the exception of the judgment entered in favor of FGIC and St. Paul Fire & Marine Insurance Company ("St.Paul"). Lennar moved to vacate and reenter that judgment under Arizona Rule of Civil Procedure 60(c) so that it could timely appeal the FGIC judgment in conjunction with the others. The trial court granted the motion and reentered the judgment. Lennar timely appealed from the second judgment, and FGIC timely cross-appealed, arguing the court erred in granting the Rule 60(c) relief. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## ANALYSIS

¶ 11 During the course of these proceedings, Lennar has settled all of the Pinnacle Hill claims with the underlying plaintiffs. The question remains, however, whether the insurers had a duty to defend Lennar in the Pinnacle Hill lawsuit. The scope of the duty to defend under an insurance policy can be broader than the scope of the duty to indemnify. The "insurance policy language controls the scope and extent of an insurer's duty to defend." *Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 165, 168, 913 P.2d 505, 508 (App.1996). In relevant part, the policies at issue essentially provide that the insurers "will have the right and duty to defend the insured against any 'suit' seeking damages" to which the insurance coverage applies.[7] Pursuant to such

---

5. Lennar invited Auto–Owners, the insurer of Morrison as of February 1999, to attend both meetings, but Auto–Owners declined the invitation.

6. In light of the summary judgments entered against it, Lennar stipulated to the entry of judgment in favor of U.S. Fire.

7. In its brief, U.S. Fire raises the policy language found in the self-insured endorsement to its policy that disclaimed any duty to defend. The brief contains no argument that the endorsement precludes a duty to defend, and at oral argument U.S. Fire made clear that at this point it does not rely on the text of the endorsement as a basis for affirming the trial court's summary judgment. Because this issue is not before us, we do not

language, the insurer would have the duty to defend a suit alleging facts that, if true, would give rise to coverage, even though there would ultimately be no obligation to indemnify if the facts giving rise to coverage were not established. Thus, pursuant to such policy language, the obligation to defend a suit may be broader than the obligation to indemnify.

¶ 12 Whether the insurers had a duty to defend the Pinnacle Hill lawsuit is determined by the allegations made against Lennar by the Pinnacle Hill plaintiffs. If the plaintiffs' allegations implicate any insurance coverage on which Lennar is a named insured, then the insurers owe a duty to defend Lennar. *W. Cas. & Sur. Co. v. Int'l Spas of Ariz., Inc.*, 130 Ariz. 76, 80, 634 P.2d 3, 7 (App.1981).

¶ 13 The policies at issue essentially provide coverage to Lennar for "those sums that [Lennar] becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies." The insurance applies to ... 'property damage' "only if: (1) The ... 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and (2) The ... 'property damage' occurs during the policy period." [8]

¶ 14 While the insurers do not deny that the Pinnacle Hill lawsuit contains a negligence count, they first argue that, for a number of different reasons, the complaint does not sufficiently allege an occurrence to implicate their coverage. They also argue that even assuming the complaint alleges an occurrence, the occurrence preceded the coverage period of the policies at issue. Finally, they allege various other reasons why Lennar was not entitled to a defense here. We address these contentions in turn.

## A. Occurrence.

¶ 15 Virtually all policies at issue define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [9] The initial Pinnacle Hill complaint seemed to have as its principal focus Lennar's construction of Pinnacle Hill on expansive soil as opposed to other flaws in construction of Pinnacle Hill. Thereafter, however, by amendment, the Pinnacle Hill plaintiffs expanded the scope of the negligent construction count in their complaint. Lennar does not contend that all counts such as the counts for fraud and breach of warranty in the amended complaint allege an "occurrence" covered by the policies. It does assert, however, that at least the negligent construction count alleges facts covered by the various CGL policies. In Arizona, "if any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the plaintiff will recover (if any) until the action is completed." *W. Cas. & Sur.*, 130 Ariz. at 79, 634 P.2d at 6; *see also Scottsdale Ins. Co. v. Van Nguyen*, 158 Ariz. 476, 477–78, 763 P.2d 540, 541–42 (App.1988) (an uncovered, concurrent cause of harm does not defeat coverage if there is a separate, covered cause of harm).

¶ 16 The insurers, however, argue that even the negligent construction count does not trigger their duty to defend because: (1) faulty workmanship cannot constitute an occurrence under Arizona law; (2) the natural consequences of faulty workmanship cannot constitute an occurrence; (3) the workmanship, whether faulty or not, does not constitute an occurrence because an occurrence must be an accident and the subcontractors intended to accomplish the work in the way

---

address it. *See Nat'l Broker Assocs., Inc. v. Marlyn Nutraceuticals, Inc.*, 211 Ariz. 210, 217, ¶ 30, 119 P.3d 477, 483 (App.2005).

8. The language of the insuring clause in the UNIC policy issued to Wheeler differs slightly but not materially: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence."

9. The UNIC policy defines "occurrence" slightly differently from the rest of the insurance policies as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." No party to this appeal argues that this different language has any effect on the arguments made by the parties.

that they did; (4) the complaint did not allege negligence in the work of specific subcontractors sufficient to create a duty for insurers of that subcontractor's scope of work to provide a defense to Lennar; and (5) if there were "occurrences," they happened before some or all of the policies were in effect.

### 1. While Faulty Construction Does Not Constitute an Occurrence, Damage to the Property Resulting From Faulty Work May Constitute an Occurrence.

¶ 17 All of the insurers argue that even if the subcontractors' work was faulty, Arizona law specifies that "faulty workmanship, standing alone, cannot constitute an occurrence as defined in [a CGL] policy, nor would the cost of repairing the defect constitute property damages." *United States Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 163 Ariz. 476, 482, 788 P.2d 1227, 1233 (App.1989). They are correct that the court in *Advance Roofing* so holds. Nevertheless, the court in *Advance Roofing* itself draws a distinction between faulty workmanship standing alone and faulty workmanship that causes damage to property.

¶ 18 In *Advance Roofing*, a roofing company performed faulty work for a homeowners' association. 163 Ariz. at 477–78, 788 P.2d at 1228–29. The association filed suit alleging that "[t]he work ... performed ... was not completed in accordance with the contract requirements and was not performed in a good and workmanlike manner." *Id.* at 478, 788 P.2d at 1229. There was no allegation that the faulty work caused other property damage. Advance Roofing tendered the defense of the claim to USF & G, its CGL insurer, which refused to defend or indemnify Advance Roofing because, inter alia, faulty workmanship did not constitute an occurrence. *Id.* The trial court granted USF & G summary judgment on that basis. *Id.* at 479, 788 P.2d at 1230.

¶ 19 On appeal Advance Roofing relied on *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450 (Minn.1977), to establish that faulty work alone constitutes an occurrence under a CGL policy. *Id.* at

482, 788 P.2d at 1233. We rejected that assertion and noted that in *Ohio Casualty* an occurrence existed not because the work was faulty but because the faulty work caused other damage to the home: "[T]he court held that the *settling of a building* as a result of faulty workmanship was the occurrence." *Id.* Thus, the damage caused by the faulty work, not the faulty work itself, constituted an occurrence, and where no property damage was alleged as a result of the faulty work, there was no occurrence.

¶ 20 In this case, however, unlike in *Advance Roofing*, the Pinnacle Hill plaintiffs alleged damage resulting at least in part from faulty workmanship, including cracks in the walls, baseboard separation, and floor tile grout cracks and separation. These allegations were contained in the Pinnacle Hill plaintiffs' original complaint and in their subsequent disclosure statements detailing the nature of their claims. The Pinnacle Hill plaintiffs, therefore, do not claim faulty work alone; they also claim that property damage resulted from the faulty work. This is sufficient to allege an occurrence under the policies at issue.

### 2. The Policy Language Covers The Natural Consequences of Negligent Construction.

¶ 21 The insurers further argue that the damage resulting from faulty work does not constitute an occurrence under the policies because such damage is the natural consequence of the negligent construction and thus cannot be an occurrence separate from that faulty construction. Illinois courts have adopted such an approach. *See, e.g., Monticello Ins. Co. v. Wil–Freds Constr., Inc.*, 277 Ill.App.3d 697, 214 Ill.Dec. 597, 661 N.E.2d 451, 456 (1996) (holding that "natural results of the negligent and unworkmanlike construction of a building do not constitute an occurrence").

¶ 22 But, as the insurers acknowledge, the Illinois position is in the minority. *See, e.g., Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 725–26 (5th Cir. 1999) (holding that under Texas law parking lot damage resulting from installation of substandard fill materials constituted an occur-

rence); *Kalchthaler v. Keller Constr. Co.*, 224 Wis.2d 387, 591 N.W.2d 169, 173 (App.1999) (windows leaking as a result of negligent installation of windows was an occurrence); *High Country Associates v. N.H. Ins. Co.*, 139 N.H. 39, 648 A.2d 474, 478 (1994) ("continuing exposure to moisture seeping through the walls of the units" of a condominium caused by negligent construction was an occurrence); *Erie Ins. Exch. v. Colony Dev. Corp.*, 136 Ohio App.3d 406, 736 N.E.2d 941, 947 (1999) (negligent construction of condominium complex that resulted in property damage constituted an occurrence).

¶ 23 We reject the view urged by the insurers, not only because it is the minority position but also because it runs contrary to the plain language of the policies. In interpreting an insurance contract, we look first to the policy language. *Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 158, ¶ 67, 98 P.3d 572, 593 (App.2004). "We construe the provisions of an insurance policy according to their plain and ordinary meaning." *Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, ¶ 13, 61 P.3d 22, 25 (App.2002).

¶ 24 The policy language defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Faulty construction may constitute a "general harmful condition." Thus, when "accidental" property damage results from continued exposure to faulty construction, that property damage is an "occurrence" as defined by the plain terms of the policy. Lennar has alleged, and produced some facts to establish, that property damage including separation and cracks in the walls and floors of the various homes, resulted from exposure to faulty construction. Such damage, if established, constitutes an "occurrence" under the policy and, in the absence of an applicable policy exclusion, is covered even if it is a natural consequence of faulty construction.

¶ 25 Some of the insurers argue that the policies in this case exclude coverage for damage to Lennar's work. They argue that the homes damaged were Lennar's work,

and, therefore, damage to those homes was not covered under their policies. But, according to all of the policies containing such an exclusion, the exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on [Lennar's] behalf by a subcontractor." Thus, the CGL policies at issue contemplate and explicitly *cover* damage to an insured's work resulting from work performed on the insured's behalf by a subcontractor. This exclusion, therefore, does not support the summary judgments entered here.

**3. Property Damage Resulting From Negligent Construction Can Be Accidental.**

¶ 26 The insurers further argue that even the allegations of negligent construction in the complaint do not sufficiently allege "occurrences" because an occurrence must be accidental, and the construction was intentionally or at least knowingly accomplished.[10] "[T]he backing was fastened to the frame and drywall exactly the way the worker meant to fasten them [sic]; and, the frame and stucco were applied the way the worker meant to apply them. There was no 'accident.'" Respondents United States Fidelity and Guaranty Company, Transamerica Insurance Company and United States Fire Insurance Company's Joint Answering Brief at 27.

¶ 27 Besides being based on factual assumptions that are not in the record—that the subcontractors accomplished their construction exactly as they intended—this argument runs contrary to Arizona insurance law. Even if workers do what they intend to do when performing specific acts of construction, that does not establish, should the work turn out to be faulty, that the subcontractor intended to provide faulty work.

¶ 28 In *Phoenix Control Sys., Inc. v. Ins. Co. of N. America*, 165 Ariz. 31, 35, 796 P.2d 463, 467 (1990), an insured agreed that he intended to use material copyrighted by his competitor in soliciting business from a po-

---

10. The insurers raise no argument that, pursuant to the policy language at issue here, an accident must be sudden. Nor, given the policy language that an occurrence includes damage "resulting from continued exposure to generally harmful conditions" could they successfully do so.

tential client because he believed he had the legal right to use the material. When he was sued by the holder of the copyright for infringement, his insurer, whose policy covered liability for copyright infringement but excluded coverage for intentional acts, declined to provide a defense. The supreme court, in reversing the declaratory judgment in favor of the insurer, noted that a court could not say that the intentional act exclusion applied as a matter of law because "there is no presumption in insurance law that a person intends the ordinary consequences of his actions." Thus, the question presented was not whether the insured intended to use the copyright but whether the insured intended to engage in copyright infringement. *Id.* at 35, 796 P.2d at 467. ("An act, even though intentional, must be committed for the purpose of inflicting injury or harm."). *See also, Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 449, 675 P.2d 703, 709 (1983) (holding the subjective intent of the insured to be a question of fact when insured "threw an elbow" in a basketball game). Thus, even if the insurers could establish that the subcontractors intended to accomplish the construction in the way that they did, that would not, as *Phoenix Control* demonstrates, establish in and of itself that they expected or intended their construction to cause property damage. It is only when the "nature and circumstances of the insured's intentional act [are] such that harm [is] substantially certain to result [that] intent may be inferred as a matter of law." *Phoenix Control,* at 36, 796 P.2d at 468.

¶ 29 Even if the insurers could establish that the subcontractors intended their work to be faulty, Lennar was also an insured. Establishing that the subcontractors intended to engage in faulty construction would not establish that Lennar intended for them to do so. Whether an event is accidental is evaluated from the perspective of the insured. *See, e.g., Butler v. Farmers Ins. Co. of Ariz.*, 126 Ariz. at 371, 373, 616 P.2d 46, 48 (1980) (when stolen automobile was recovered by true owner, the loss to the insured, who was a bona fide purchaser of the stolen

automobile, was "accidental," entitling him to coverage); *see also 16 Holmes' Appleman on Insurance 2d* § 117.3(B) at 241 (2000) ("[A]n accident is anything that happens or is the result of that which is unanticipated and takes place without the insured's foresight or expectation or intention."). Lennar is the insured here, and the insurers have not offered evidence to establish that Lennar intended or anticipated damage as a result of the negligent work of its subcontractors. Thus, the summary judgment to the insurers cannot be supported on the basis that Lennar intended to engage in faulty construction in building the homes.[11]

## B. The Complaint Sufficiently Implicated Coverage.

¶ 30 The insurers that issued policies to the subcontractors argue that to the extent that the Second Amended Complaint alleges negligent construction, it does not do so with sufficient specificity to implicate the work of any specific subcontractor or subcontractors. Thus, they argue, the allegations of the complaint do not give rise to a duty requiring that the insurers of any specific subcontractor's work provide a defense to Lennar.

¶ 31 Even assuming the complaint did not otherwise identify any specific subcontractor as negligent sufficient to create in its insurer an obligation to defend Lennar as an additional insured, according to Arizona law, once an insured makes some factual showing that the suit is actually one for damages resulting from events that fall under policy terms, an insurer has a duty to investigate those facts and provide a defense when indicated. *Advance Roofing*, 163 Ariz. at 480, 788 P.2d at 1231.

¶ 32 When the complaint was filed, and negligent construction alleged, Lennar hired Roel to investigate the cause of the property damage. After inspection and testing, Roel determined that the property damage complained of was caused at least in part by the negligent performance of Wheeler, Morrison

---

11. For these same reasons the language in the various insurers' policies excluding coverage for property damage "expected or intended" by the insured is also an insufficient basis on which to affirm summary judgment here.

and Metro Drywall. There are affidavits in the record by Roel's principals and its consultants containing these conclusions. The insurers argue that this only amounts to speculation by Lennar "about unpled third party claims to manufacture coverage." *Hurley Constr. Co. v. State Farm Fire and Cas. Co.,* 10 Cal.App.4th 533, 12 Cal.Rptr.2d 629, 631 (1992). We disagree.

¶ 33 The complaint contains a cause of action for property damage caused by negligent construction—a claim, if proven, for which the policies may provide coverage. Lennar has put forward affidavits from its consultants identifying the subcontractors whose work caused the damage and detailing how such damage was caused. This amounts to more than speculation. It amounts to at least some "factual showing that the suit is actually one for damages resulting from events which do fall into policy terms." To sustain summary judgment that it had no duty to defend under such circumstances, the insurer is obliged to investigate and establish that the true facts of the case take the complaint outside the policy coverage. *Advance Roofing,* 163 Ariz. at 480, 788 P.2d at 1231; *W. Cas. & Sur. Co.,* 130 Ariz. at 79, 634 P.2d at 6; *Kepner v. W. Fire Ins. Co.,* 109 Ariz. 329, 331, 509 P.2d 222, 224 (1973). On the record provided here, none of the insurers has yet done so.[12]

## C. Ongoing Damage May Have Occurred During the Policy Periods and Therefore Triggered an Obligation to Defend Under Those Policies.

■ ¶ 34 The insurers also argue that even if there was an "occurrence" as defined by the policies, the "occurrence" took place before the periods in which some or all of the policies at issue provided coverage to Lennar. Pinnacle Hill homes began manifesting some damage shortly after the first homes in the development were completed and sold.

The insurers thus argue that all of the property damage should be deemed to have occurred when the first property damage manifested itself.

■ ¶ 35 The nature of an occurrence policy, however, is to provide coverage for all occurrences that take place during the policy period. The policies here cover " 'property damage' only if: ... [t]he ... 'property damage' occurs during the policy period." *See also Thoracic Cardiovascular Assocs., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 181 Ariz. 449, 452, 891 P.2d 916, 919 (App.1994) (occurrence policies cover occurrences "within the policy period, regardless of the date of discovery or the date the claim is made or asserted"). Lennar has set forth by affidavit expert testimony that property damage attributable to the negligence of its subcontractors continued on the property at least through 1999.

¶ 36 The policy language defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." By definition, property damage resulting from "continuous or repeated exposure" may accrue over time. In such cases, the relevant date for coverage purposes is the date the property damage occurs, even if that damage is incremental.

■ ¶ 37 According to Arizona law, there can be no "occurrence" within the meaning of an insurance policy until a plaintiff sustains actual damage. *State v. Glens Falls Ins. Co.,* 125 Ariz. 328, 330–31, 609 P.2d 598, 600–01 (App.1980) (no compensable occurrence under insurance policy until depositor was actually unable to withdraw funds; mere potential for losses during period of thrift association's insolvency was insufficient); *Outdoor World v. Cont'l Cas. Co.,* 122 Ariz. 292, 295, 594 P.2d 546, 549 (App.1979) (adopting

---

12. The subcontractors' insurers also argue that the property damage does not "arise out of" the negligent work of Wheeler or Metro Drywall as its policies require. But, "[i]n interpreting 'arising out of' language, we have not required direct proximate cause ... but only some causal relation or connection between the two." *Salerno v. Atlantic Mut. Ins. Co.,* 198 Ariz. 54, 58, ¶ 16, 6 P.3d 758, 762 (App.2000). Here the record contains various affidavits by the officers of Roel and TerraPacific, Lennar's soil consultants, adequately creating an issue of fact as to the cause of the property damage. Thus, Lennar has presented sufficient evidence to create a question of fact whether the damages "arose out of" the work of the subcontractors and thus to defeat summary judgment.

"general rule that coverage is determined by the time of the ... damage and not the conduct on the part of the insured that gave rise to the ... damage"). This rule obtains even if the property damage occurring during the policy period is incremental. *Associated Aviation Underwriters,* 209 Ariz. at 167, ¶ 96, 98 P.3d at 602.

¶ 38 Thus, pursuant to the plain language of their policies, insurers must provide coverage for ongoing property damage that occurs during the policy period even if other similar damage preceded that damage. *Cf. id.* (holding that the initial exposure to the harmful condition, the latency period between the exposure and manifestation of the injury, and the time when the damage manifests each constitute an occurrence that triggers coverage under an occurrence-based liability policy when physical injury resulting from previous exposure to a harmful substance actually manifests itself).

¶ 39 In sum, to the extent that property damage occurs during the period for which Lennar is a named insured on a policy purchased by one of its subcontractors, it is entitled to coverage for qualifying occurrences during that policy period, and thus to a defense on a complaint alleging such claims. The question of how much damage, if any, was actually sustained during any given policy period and how much, if any, of that damage was attributable to the subcontractors is a question of allocation for the trial court to determine. But, this question of fact prevents the insurers from claiming that the trial court should have granted them summary judgment on the grounds that no occurrence took place during the policy period.

¶ 40 The insurers alternatively argue that the known-loss rule, sometimes referred to as the loss-in-progress rule, precludes Lennar from seeking coverage. The known-loss rule prevents an insured from seeking coverage when a loss was "known or apparent" to the insured at the time it obtained the policy under which the insured seeks coverage without disclosing the "known loss" to the insurer. *See, e.g., Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 904 (1995).

Thus, the insurers argue Lennar cannot seek a defense due to losses alleged to have occurred at Pinnacle Hill under policies Lennar either purchased or obliged its subcontractors to purchase after Lennar knew of the basis for asserting that the ongoing losses it was sustaining at Pinnacle Hill might be covered under those policies.

¶ 41 In this case, however, none of the insurers raised the known-loss rule at the trial court as a basis on which they were entitled to summary judgment as to Lennar's claimed entitlement to a defense from the insurers. The record, therefore, does not contain facts demonstrating when Lennar knew that the property damage at Pinnacle Hill was or might be attributable at least in part to the work of the various subcontractors and what, if any, coverage it obtained after that time. There are thus insufficient facts before us upon which we may evaluate whether Arizona should adopt the known-loss rule and if so, how that rule should be applied in this context. *Compare Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis.2d 16, 673 N.W.2d 65, 85–86 (2004) (holding known loss doctrine precluded coverage when extent of damage from settling buildings was substantially known before policies issued) *with Montrose Chem. Corp.,* 42 Cal. Rptr.2d 324, 913 P.2d at 904–06 (holding the insured's knowledge of problems at the time the policies were written does not prevent coverage under the known loss rule so long as there remains a contingency with respect to whether and to what extent coverage will be invoked). At this point, the known-loss rule provides no basis on which we can affirm summary judgment.

## D. Alternative Bases to Support Summary Judgment.

### 1. Lennar was not an additional insured under the policy issued to Wheeler by UNIC.

¶ 42 On appeal, UNIC asserts that the summary judgment in its favor should be affirmed because while it insured Wheeler, Lennar was not an additional insured on that policy.

¶ 43 UNIC's policy, issued to Wheeler on July 1, 1994, does not list Lennar as an additional insured. Instead, it contains a blanket additional insured endorsement. The endorsement provides that:

> Any person, corporation, organization, partnership, joint venture or other interest with whom the *Named Insured [Wheeler] has agreed to provide liability insurance* is included as an Insured, but only with respect to acts or omissions in connection with the Named Insured's operations; . . .

(Emphasis added.) The question then is whether Wheeler agreed to provide liability insurance to Lennar.

¶ 44 Lennar claims that its contract with Wheeler demonstrates that Wheeler agreed to provide it with liability insurance. We disagree.

¶ 45 Lennar argues that when read in conjunction with each other, Paragraphs 9.12 and 17.1 of its contract with Wheeler obligate Wheeler to provide Lennar with insurance. Paragraph 9.12 provides that Wheeler will indemnify Lennar for any expenses "arising out of or resulting from performance of" Wheeler's work.[13] The requirement that Wheeler indemnify Lennar is not an agreement that Wheeler obtain insurance that could provide a defense for Lennar. *See, e.g., Paulin v. Fireman's Fund Ins. Co.*, 1 Ariz.App. 408, 410–11, 403 P.2d 555, 557–58 (1965) (holding the duty to defend is separate from the duty to indemnify). Thus, Wheeler's agreement to indemnify Lennar is not sufficient to oblige Wheeler's insurer to provide Lennar with a defense to a lawsuit in which Lennar, but not Wheeler, is a defendant.

¶ 46 Nor is Wheeler's agreement to insure its work an agreement to name Lennar as an additional insured under its policy. In paragraph 17.1, Wheeler agreed to "purchase . . . and maintain . . . insurance . . . for damages, other than to the Work itself, to property which may arise out of . . . [Wheeler's] operations under the Contract. . . ."[14] But again, Wheeler's obligation under its contract with Lennar to insure its contract operations does not constitute an obligation for Wheeler to insure Lennar for Wheeler's contract operations. Paragraph 17.2 of the contract between Lennar and Wheeler explicitly states:

> The Owner [Lennar] shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under the Contract. The Contractor [Wheeler] shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

¶ 47 In *Brillante v. R.W. Granger & Sons, Inc.*, a general contractor, Granger, which had been sued for personal injury, sued two of its subcontractors "seeking contribution, indemnification, and costs and attorney's fees for defending the suit." 55 Mass.App.Ct. 542, 772 N.E.2d 74, 76 (2002). Granger claimed that both subcontractors "breached their subcontracts by failing to name Granger as an additional insured in their insur-

---

**13.** The full paragraph provides:

> 9.12 To the fullest extent permitted by law, *the Contractor [Wheeler] shall indemnify and hold harmless the Owner [Lennar]*, Architect, Architect's consultants, and agents and employees of any of them *from and against claims, damages, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from the performance of the Work*, provided that such claim, damage, loss or expense is attributable to . . . destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but *only to the extent caused in whole or in part by negligent acts or omissions of the Contractor*, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

**14.** The paragraph in full states:

> 17.1 The Contractor [Wheeler] shall purchase . . . and maintain . . . insurance for protection from claims . . . for damages, other than to the Work itself, to property which may arise out of or result from the Contractor's operations under the Contract. . . . The insurance . . . *shall include contractual liability insurance applicable to the Contractor's [Wheeler's] obligations under Paragraph 9.12.* Certificates of such insurance shall be filed with the Owner prior to the commencement of the Work.

ance contracts relating to the construction project." *Id.* at 78. On appeal, the *Brillante* court considered the subcontracts and found that while the subcontracts required the subcontractors to obtain *their own* insurance, there was no express requirement that either subcontractor name Granger as an additional insured. *Id.* at 79.

¶ 48 In this case, as in *Brillante*, an agreement to obtain insurance is not the same as an agreement to add a general contractor as an additional insured. *See id.* Furthermore, nothing in the written contract between Lennar and Wheeler requires Wheeler to name Lennar as an additional insured under the policy. *See* Werner Sabo, *Legal Guide to AIA Documents* § 5.49, at 478 (4th ed.1998) (suggesting alternative language for insurance clause of construction contract if general contractor wants to be named as an additional insured on subcontractor's liability policy).[15]

¶ 49 Although Lennar asserts that a factual question exists whether its contract with Wheeler required Wheeler to name it as an additional insured, Lennar points to no language in the written agreement that is reasonably susceptible to such an interpretation. *See Long v. City of Glendale*, 208 Ariz. 319, 328, ¶¶ 28–29, 93 P.3d 519, 528 (App.2004) (extrinsic evidence must be precluded if written language not reasonably susceptible to interpretation asserted by proponent of extrinsic evidence). Thus, we hold that Lennar is not an additional insured under Wheeler's UNIC policy, and we affirm the summary judgment granted to UNIC on that basis.

## 2. Amending of pleadings to include FGIU.

¶ 50 On appeal, FGIC contends that it did not issue the policy to Metro Drywall that is involved in this case. Instead, it asserts the

policy was issued by FGIU. FGIC contends that FGIU is a separate entity from FGIC and that it notified FGIU of the litigation.[16] FGIU has never been a party to the proceedings. Lennar argues that we should allow it leave to amend the pleadings to include FGIU as a party. It may raise this argument to the trial court on remand.[17]

## 3. Rule 60(c) cross-appeal.

 ¶ 51 FGIC next argues that the trial court abused its discretion in vacating and reentering judgment pursuant to Rule 60(c) so that Lennar could file a timely appeal against FGIC in this case. "The decision to vacate and reenter judgment is left to the sound discretion of the trial court, so long as this discretion is not exercised in clear violation of the principles announced in *Park*." *J.C. Penney v. Lane*, 197 Ariz. 113, 117, ¶ 21, 3 P.3d 1033, 1037 (App.1999). In *Park v. Strick*, our supreme court held that relief "may be considered where the party did not have knowledge from any source that judgment had been entered and where there are extraordinary circumstances." 137 Ariz. 100, 104, 669 P.2d 78, 82 (1983). In *City of Phoenix v. Geyler*, the court went on to adopt the following four factors, put forward by the Ninth Circuit in *Rodgers v. Watt*, for a court to consider in deciding whether to grant relief: "(1) absence of [Rule 58(e) ] notice; (2) lack of prejudice to respondent; (3) prompt filing of a motion after actual notice, and (4) due diligence, or reason for lack thereof, by counsel in attempting to be informed of the date of the decision." 144 Ariz. 323, 328, 697 P.2d 1073, 1078 (1985) (quoting *Rodgers v. Watt*, 722 F.2d 456, 460 (9th Cir.1983)).

¶ 52 In granting Lennar's motion under Rule 60(c) with respect to the judgments

---

(Emphasis added).

15. "The policies and the certificates required herein shall name the Owner and Architect as *additional insureds and shall be subject to the* approval of the Owner and Architect. The Contractor shall furnish the Owner and Architect copies of any endorsements that are subsequently issued amending coverage or limits."

16. FGIC also issued a policy to Wheeler on which Lennar is an additional insured. Thus

FGIC remains a party in this matter even if Lennar's claims against it as the insurer of Metro Drywall should prove to have no validity.

17. FGIC further requests that St. Paul be dismissed as a party to this appeal. It is not apparent on this record, however, whether St. Paul is a proper defendant based on the policy apparently issued to Wheeler. This request to dismiss St. Paul should therefore also be addressed to the trial court on remand.

entered on behalf of FGIC and St. Paul, the trial court did not specifically address each of these elements. The court said only: "There is no doubt in all counsels' minds (I'm clairvoyant!) or the Court's that Lennar would appeal all Judgments and Orders. Given the number of parties, pleadings, etc., the Court grants Lennar's Motion for Rule 60 Relief."

¶ 53 We cannot say that the trial court abused its discretion in granting Lennar relief. The court did not issue a minute order that the judgment had been signed as it had done with respect to the judgments in favor of the other defendants. This meant that one of the back-up procedures for making sure Lennar's attorneys were informed of the judgment failed. Then, when the firm did receive a copy of the judgment "on or about December 4, 2003," or about three days after judgment was entered, the original copy of the judgment was placed in the file without a copy of the document being made and routed to the attorney as required by the firm's protocol for tracking judgments entered in this consolidated case. Counsel discovered the original in the file during a case management meeting on January 9, 2004. Lennar filed its motion for relief on January 13, 2004, which was two business days after the attorney had learned the judgment had been entered on December 1, 2003.

¶ 54 Considering the *Rodgers* factors in assessing the situation, the facts in this case support the trial court's ruling. The first *Rodgers* factor is absence of notice. Here, Lennar's law firm never received a minute entry notice of judgment as was the trial court's usual practice in this case. Further, although the law firm was mailed a copy of the judgment three days after it had been entered, a staff member at Lennar's firm failed to follow the procedure instituted in this case for tracking judgments and merely placed a copy of the judgment in the file rather than routing a copy of the judgment

to the lawyer responsible. In Arizona, it is within the realm of the court's discretion to find such errors to be excusable in such contexts. *See, e.g., Geyler*, 144 Ariz. at 332, 697 P.2d at 1082 (holding that "clerical and secretarial errors in office procedures are unavoidable and ... [often] excusable") quoting *Daou v. Harris*, 139 Ariz. 353, 360, 678 P.2d 934, 941 (1984); *see also Coconino Pulp & Paper Co. v. Marvin*, 83 Ariz. 117, 120–21, 317 P.2d 550, 552–53 (1957) (granting relief based on attorney's reasonable reliance on secretary to notify him of due date for answering complaint when "through some inadvertent clerical error the lawyer [had not been] informed").[18]

¶ 55 As for the second factor, lack of prejudice to FGIC, the trial court's statement indicates that all of the counsel involved surely anticipated that Lennar would appeal, and we also note that Lennar did not miss the deadline to appeal by much. FGIC argues it was prejudiced because Lennar was allowed to appeal at all, but the issue is not whether FGIC was prejudiced by Lennar being allowed to appeal but whether it was prejudiced by the appeal being delayed rather than timely. *See, e.g., Geyler*, 144 Ariz. at 332, 697 P.2d at 1082 ("The parties have been litigating for over five years; it is difficult to imagine how a short delay in appeal time could have been prejudicial to the City."). Lennar makes no showing of such prejudice.

¶ 56 It is also clear that counsel filed a motion promptly after having learned that judgment had been entered, which is the third consideration identified by *Rodgers*.

¶ 57 And as for the fourth factor, due diligence in attempting to be informed of the date of the decision, the trial court's comment indicates that consideration of the number of parties and pleadings weighed in Lennar's favor. As the affidavit of Lennar's

**18.** Rule 58(e) was amended post-*Geyler* so that its final sentence now states (with the clause added in 1994 in italics):

> Lack of notice of the entry by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, *except as provided in rule 9(a), Arizona Rules of Civil Appellate Procedure.*

Although Rule 9(a), which was simultaneously amended, does not list excusable neglect as a justification for allowing a delayed appeal, we held in *Lane* that trial courts nonetheless retain full authority under Rule 60(c) to grant relief pursuant to previous case law. 197 Ariz. at 116–17, ¶¶ 16–20, 3 P.3d at 1036–37. We follow *Lane* here.

attorney further demonstrates, Lennar had implemented a multi-tiered process to keep track of judgments in this case. It was within the realm of the trial court's discretion to find that such tracking procedures met the required standard for due diligence.

¶ 58 Considering all four of the *Rodgers* factors, the trial court did not abuse its discretion in granting Lennar's motion. We thus affirm the court's decision to grant the Rule 60(c) motion to vacate and reenter judgment to allow the delayed appeal.

### 4. Bad faith claim.

¶ 59 Although the trial court granted summary judgment as to the insurers on both Lennar's breach of contract and bad faith claims, it offered no explanation as to the reasons underlying its judgments. We presume that, consistent with the insurers' arguments below, it found that if there was no duty to indemnify or defend,[19] the insurers could not have acted in bad faith in refusing to indemnify or defend. Because we reverse the trial court's summary judgment in favor of the insurers on the breach of contract claim, in the absence of an independent basis to sustain the trial court's summary judgment on the bad faith claim, we similarly reverse that summary judgment. We also vacate any attorneys' fees awarded.

### E. Attorneys' Fees on Appeal.

¶ 60 We have the discretion to award reasonable attorneys' fees to a prevailing party in an insurance contract dispute pursuant to A.R.S. § 12–341.01(A) (2003). *Progressive Classic Ins. Co. v. Blaud,* 212 Ariz. 359, 364, ¶ 21, 132 P.3d 298, 303 (App.2006).

¶ 61 Because UNIC is the prevailing party in its appeal, we award it reasonable attorneys' fees upon compliance with Arizona Rule of Civil Appellate Procedure 21. However, because no other party has yet prevailed, we decline to further award attorneys' fees at this time. Upon remand and following final resolution of the case on the merits the trial court is authorized to consider the

fees and costs incurred in this appeal in determining whether and how much to award the prevailing party or parties as reasonable attorneys' fees.

### CONCLUSION

¶ 62 For the foregoing reasons, with the exception of the summary judgment granted to UNIC, the trial court erred in granting summary judgment to the insurers on the breach of contract and bad faith claims. We thus reverse and remand for further proceedings consistent with this opinion.

CONCURRING: PHILIP HALL, Presiding Judge, and PATRICIA K. NORRIS, Judge.

---

19. FGIC argues that Lennar has waived any claim for indemnity by not raising indemnity as an issue in its appeal. Lennar's argument that it is entitled to a defense is, however, premised on the argument that it would be entitled to indemnity if the Pinnacle Hill plaintiffs' claims were established. Under these circumstances, we decline to find waiver.